594 A.2d 609

**Frederick William REYNOLDS, Jr.**

v.

**STATE of Maryland.**

**No. 1247, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Aug. 29, 1991.

Judith S. Stainbrook (Stephen P. Bourexis, on the brief), Westminster, for appellant.

Diane Krejsa, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Thomas E. Hickman, State's Atty. for Carroll County, Westminster, on the brief), for appellee.

Argued before MOYLAN and DAVIS, JJ., and JAMES S. GETTY (retired), Specially Assigned.

MOYLAN, Judge.

The sets of rules circumscribing the admissibility of incriminating statements are many. They are, moreover, distinct. This appeal requires us to sort them out and to look at several of them in appropriate isolation.

The appellant, Frederick William Reynolds, Jr., was convicted by a Carroll County jury, presided over by Judge Donald J. Gilmore, of 1) second-degree rape, 2) a second-degree sexual offense, 3) assault with intent to rape, 4) assault with intent to commit a second-degree sexual offense, and 5) incest. Upon this appeal, he raises the single contention that his various incriminating admissions and confessions should have been suppressed because they were obtained in violation of the privilege against compelled self-incrimination of the Fifth Amendment and the due process clause of the Fourteenth Amendment of the Federal Constitution and of their Maryland counterparts, Articles 22 and 23 of the Maryland Declaration of Rights.

Analytically, this generic contention splits into two doctrinally distinct situations. Successive incriminating conversations over an extended period of time fell into one or the other of two categories: 1) conversations with a psychological counsellor, Marcia Meyer, at the Family Children's Service Center; and 2) subsequent conversations with Corporal Richard Norman of the Maryland State Police.

## *The Factual Background*

The unfolding of this case did have an unusual twist. Although ample corroboration of the *corpora delicti* was produced at trial, the very occurrence of the crimes, quite aside from any evidence of criminal agency, only came to light when the appellant himself revealed them, first to a psychological counsellor and then to police authorities. The victims of the appellant's sexual abuses, perpetrated at least twelve years earlier, were his now-adult daughters, no longer living at home.

The appellant is a 56–year–old Carroll County farmer with a high school education. At a family gathering on Mother's Day, 1989, his family collectively confronted him with having sexually abused his four daughters when they were children. At his family's urging, he sought counselling, first with the family minister. His minister, sensing the dimensions of the problem, in turn referred him to Marcia Meyer at the Family Children's Service Center in Westminster.

When the appellant, accompanied by his wife, first visited Ms. Meyer at the Westminster Center, he was told that in order to obtain counselling, he would have to sign a form consenting to the Center's notification of the police of any incriminating evidence regarding child abuse. Ms. Meyer fully advised the appellant that he was not compelled to sign the form and that he was not required to receive counselling at the Center. Ms. Meyer was complying with the command of Md.Fam.Law Code Ann. § 5–704, which requires all health practitioners, human services workers, and counsellors, among others, to notify an appropriate law enforcement agency if they have reason to believe that a child has been subject to abuse.

Initially leery about signing the consent form, the appellant called the State's Attorney's Office for advice and spoke to Assistant State's Attorney Kathi Hill. Ms. Hill gave him no assurances that he would not be prosecuted. The prosecutor, fielding an unsolicited and unanticipated telephone call, obviously tried to be both helpful but cautiously candid, "Well, you should go and take your counselling now, that's the first thing. It's been a long time since this occurred, but I cannot give you advice because ... it may, in the future ... I'm a prosecutor, I prosecute these types of cases."

The appellant then decided, in the presence of his wife, to sign the consent form. He did so because "without signing that form, I could not get counseling at that place." The appellant testified that he assumed that other agencies would have a similar procedure (as was indeed the case).

The appellant began a series of counseling sessions relating to the sexual abuse of his four daughters. This collective incrimination over a series of counseling sessions was introduced at the appellant's trial and is the initial object of his present challenge.

## An Ostensible Counsellor–Patient Privilege:

### Neither Available Nor Claimed

The appellant argues that, as a result of family pressures upon him and inherent pressures within him, he desperately needed counseling. He argues further that that need, somehow coupled with Ms. Meyer's inability to extend counseling without his signing of the waiver form, rendered his various admissions and confessions involuntary.

The appellant's reasoning in this regard is a bit blurred. In no event were his confessions themselves involuntary. By his own acknowledgement, he needed to confess and wanted to confess. The confessions were an indispensable predicate to and part of the psychological catharsis and further treatment that he so affirmatively and urgently sought. In framing the issue, the appellant appears to have things doctrinally reversed, as if viewing events in a mirror image. The threat of criminal exposure to which he objects was *not* a pressure to confess; it was the precise opposite, a *pressure not to confess*. Notwithstanding that pressure, the appellant successfully resisted it and confessed anyway. Any option that was arguably burdened was not his choice to remain silent but his choice to speak.

In reframing the complaint for the appellant, we conclude that he might have argued that what was involuntary was not the confession *per se* but rather the waiver of an ostensible counsellor-patient privilege. At most, what was involuntary was not the confession but only the waiver of its confidentiality. The appellant, however, makes no such argument. He never sought to establish the existence of such a privilege.

■ Indeed, he could not have, for there is no such privilege. Save only the privilege against compelled self-incrimination, all other privileges are creatures either of the common law or of statute and are subject to legislative control. The provisions of Md.Fam.Law Code Ann. § 5–704 explicitly spell out that there is no privilege against a counsellor's legally required disclosure of the fact of child abuse to law enforcement officials.

For even more basic reasons, however, the claim of inadmissibility based upon involuntariness against Ms. Meyer and the Family Children's Service Center must fail.

### No State Action

■ At the most fundamental level, this aspect of the appellant's argument (involuntariness of either the confession or the waiver of its confidentiality) founders upon the shoals of the fact that the Westminster Family Children's Service Center is a private facility and not a State agency. The appellant argues a violation of the Fifth Amendment privilege against compelled self-incrimination made applicable to the states through the due process clause of the Fourteenth Amendment, as well as the Maryland constitutional counterparts which have consistently been construed *in pari materia* with their federal analogues. As the modifying adjective "constitutional" necessarily implies, the constitutional law (federal or state) is concerned with the constituting of government, with spelling out those things that government may do and that government may not do. It is not a code of conduct to private individuals or private corporations. When governmental action is not involved, constitutional law is not involved.

Fully dispositive in this regard is the Supreme Court's decision in *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In that case, the defendant claimed both that a confession was involuntary and that a waiver of *Miranda* rights was involuntary. Everyone agreed that the agents of government had done nothing improper. "The Colorado trial court ... found that the

police committed no wrongful acts, and that finding has been neither challenged by the respondent nor disturbed by the Supreme Court of Colorado." 479 U.S. at 165, 107 S.Ct. at 521. The coercing agent was, according to the defendant, the "Voice of God" and, according to his psychiatrist, a "command hallucination," confronting the defendant with the stark choice between confession and suicide. The defendant chose the former. In pointing out that the absence of any state action thereby rendered constitutional law inapplicable, the Supreme Court observed, at 479 U.S. 165, at 107 S.Ct. 521:

"Our 'involuntary confession' jurisprudence is entirely consistent with the settled law requiring some sort of 'state action' to support a claim of violation of the Due Process Clause of the Fourteenth Amendment."

The Fifth Amendment specifically and the Bill of Rights generally are limitations or prohibitions directed at government as government. When the Fifth Amendment provides that "No person shall be *compelled* in any criminal case to be a witness against himself," it contemplates governmental compulsion and not private compulsion. The Supreme Court went on, at 479 U.S. 165–166, at 107 S.Ct. 521:

"The difficulty with the approach of the Supreme Court of Colorado is that it fails to recognize the essential link between coercive activity of the State, on one hand, and a resulting confession by a defendant, on the other. The flaw in respondent's constitutional argument is that it would expand our previous line of 'voluntariness' cases into a far-ranging requirement that courts must divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision."

Even if we were to assume that the appellant's confessions were somehow involuntary (a conclusion not remotely suggested by the evidence in this case), no constitutional right would be implicated. There is no *constitutional* right not to give an involuntary confession; there is only a constitutional right not to be compelled to do so by govern-

ment. The Supreme Court is again illuminating, at 479 U.S. 166, at 107 S.Ct. 521:

"Moreover, suppressing respondent's statements would serve absolutely no purpose in enforcing constitutional guarantees. The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution.... Only if we were to establish a brand new constitutional right—the right of a criminal defendant to confess to his crime only when totally rational and properly motivated—could respondent's present claim be sustained." (citation omitted).

Nothing we say herein should be taken to suggest that a privately coerced, as opposed to governmentally coerced, confession could not be inadmissible but only that it would be so within a different frame of analysis. Had, hypothetically, Ms. Meyer and her companions at the Family Children's Service Center stretched the appellant upon the rack, his resultant confession might have been inadmissible but it would not have been unconstitutional.

"The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause."

479 U.S. at 166, 107 S.Ct. at 521. Such inadmissibility, however, would fall within the province of evidentiary law, concerned as it is with the evidentiary trustworthiness or competence of a tortured confession, and not within the province of constitutional law, concerned as it is with governmental behavior. The clear demarcation between evidentiary unreliability and constitutional impropriety was spelled out by the Supreme Court, at 479 U.S. 166–167, at 107 S.Ct. 521–522:

"Respondent would now have us require sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State. We think the Constitution rightly leaves this sort of inquiry to be resolved by state laws governing the admission of evi-

dence and erects no standard of its own in this area. A statement rendered by one in the condition of respondent might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum ... and not by the Due Process Clause of the Fourteenth Amendment. 'The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false.' " (citation omitted).

There is no suggestion in this case that the confessions were in any way inherently untrustworthy or incompetent in the evidentiary sense. Certainly no claim was made in that regard.

### The Introduction of State Action

The element of State action first appeared in this case on July 11, 1989. Ms. Meyer had contacted the State's Attorney's Office about the appellant's acknowledged sexual abuse of his four daughters. The State's Attorney's Office had, in turn, notified the Maryland State Police and the case was assigned to Corporal Richard E. Norman. Corporal Norman indicated to Ms. Meyer that he would like to speak with the appellant and Ms. Meyer undertook to arrange the meeting. The appellant agreed to meet with Corporal Norman at the Family Childern's Service Center in the presence of Ms. Meyer. That meeting occurred on July 11, 1989.

Initially, Ms. Meyer informed the appellant that he did not have to speak to Corporal Norman if he did not wish to do so. It was only after he agreed that Ms. Meyer introduced the two. Corporal Norman reiterated that the appellant did not have to talk to him and that he would leave at any time the appellant wished. The appellant later testified that he "jokingly" asked Corporal Norman to read him his constitutional rights and that Corporal Norman did so, reading from a printed card.

Until that interview, Corporal Norman knew nothing about the offenses. It was the appellant who supplied him with the names and addresses of his daughters. The appellant further suggested that Corporal Norman contact the daughters to find out exactly what had happened.

The thrust of the appellant's complaint does not concern itself significantly with this first meeting or with the incriminating admissions made in the course of it. It is rather the second meeting, two months later on September 6, that draws the appellant's fire. During the intervening months, Corporal Norman had continued his investigation, speaking at length with two of the appellant's daughters. After interviewing one of those daughters for several hours on September 6, Corporal Norman went to the appellant's home at a little after 4 P.M. and asked to speak to him. Corporal Norman informed the appellant that since their last interview, he had spoken to two of the daughters and received their versions of the abuses. When Corporal Norman asked whether he could speak to the appellant again about these events, the appellant responded, "Fine," and invited the Corporal into his house.

Corporal Norman informed the appellant that he was not under arrest, that he did not have to talk with him, and that if the appellant wished, the Corporal would leave. This second interview was tape-recorded. The interview lasted a little over an hour. In the course of it, the appellant repeated his version of the earlier acts of abuse. At the conclusion of the interview, Corporal Norman left. The appellant was not arrested until two days later, on September 8.

### Miranda Inapplicability:

### Absence of Custody

The appellant complains that prior to this second interview at his home on September 6, Corporal Norman did not give him the *Miranda* warnings. It is unnecessary to analyze 1) the significance of those advisements that Corpo-

ral Norman did give the appellant on September 6, or 2) the significance of the fact that *Miranda* warnings, whether required or not, had been fully given the appellant prior to his first interview on July 11. The short answer with respect to the September 6 interview is that *Miranda* was inapplicable.

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prescribed a set of warnings and advisements of rights that the police *under certain circumstances* are required to give to a suspect. The *Miranda* rule is not itself constitutional. The so-called *Miranda* catechism is rather a judicially devised implementing device, specifically designed to safeguard the Fifth Amendment privilege against compelled self-incrimination. *United States v. Mandujano,* 425 U.S. 564, 579, 96 S.Ct. 1768, 1778, 48 L.Ed.2d 212, 224 (1976), described precisely *Miranda*'s identity with the privilege and their combined function of negating the inherent "compulsion" of the custodial environment:

> "*Miranda* addressed extrajudicial confessions or admissions procured in a hostile, unfamiliar environment which lacked procedural safeguards. *The decision expressly rested on the privilege against compulsory self-incrimination;* the prescribed warnings sought to negate the 'compulsion' thought to be inherent in police station interrogation." (emphasis supplied).

When, therefore, the threat of compulsion and the antidotal Fifth Amendment privilege are involved in an extrajudicial police-citizen confrontation, *Miranda*'s implementing rule is *ipso facto* involved as well. Absent that involvement of the Fifth Amendment privilege, based upon the inherent threat of compulsion, *Miranda* is self-evidently inapplicable. The scope of an implementing rule can be no broader than the scope of the undergirding constitutional protection being implemented.

The heart of the Fifth Amendment privilege is the protection of a suspect from actual governmental compul-

sion or coercion to incriminate oneself. To determine when the threat of governmental compulsion is at work in an investigative setting, *Miranda* announced a bright line formula that the combination of custody and interrogation will be deemed to be presumptively coercive. It is, therefore, custodial interrogation that gives rise to the presumption of compulsion and brings into play the therapeutic, implementing rule of *Miranda.* Absent the combination of both custody and interrogation, there is no presumption of compulsion and there is, therefore, no call for *Miranda*'s implementing countermeasures. Of the two necessary conditions for *Miranda* applicability, the one at issue with respect to the September 6 interview is that of custody.

"Custody" ordinarily contemplates that a suspect will be under arrest, frequently in a jailhouse or station house setting. The appellant seeks solace almost exclusively in the case of *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). There, the Supreme Court found "custody" in the setting of the suspect's boardinghouse. The circumstances were, however, so extreme as to make the case readily distinguishable. In investigating a murder, four armed police officers were admitted to Orozco's boardinghouse by an unidentified woman and then burst, unannounced, into his bedroom at 4 A.M. He was immediately interrogated, even as he came awake. The police testified that he was "under arrest" at the moment the interrogation began. Following the interrogation, he was taken to the police station under arrest.

In countering Texas' claim that *Miranda* was not applicable because Orozco had been "interrogated on his own bed, in familiar surroundings," the Supreme Court pointed out that *Miranda* "warnings were required when the person being interrogated was 'in custody at the station *or otherwise deprived of his freedom of action in any significant way.*'" (emphasis in original). There is nothing in the circumstances of the September 6 interrogation of the appellant at the appellant's home, during which and after which the appellant was not under arrest, that sug-

gests that he was deprived of his freedom of action in any significant way.

Indeed, in *Berkemer v. McCarty,* 468 U.S. 420, 437, 104 S.Ct. 3138, 3148–3149, 82 L.Ed.2d 317, 333 (1984) the Supreme Court focused explicitly on the phrase from *Miranda* "otherwise deprived of his freedom of action in any significant way":

"However, we decline to accord talismanic power to the phrase in the *Miranda* opinion emphasized by respondent. Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated. Thus, we must decide whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights."

The *Berkemer* opinion reminded us that the custodial setting dealt with by *Miranda* —a setting severe enough to give rise to a presumption of compulsion—was one wherein a suspect was held "incommunicado" and "in a police dominated atmosphere." It then went on to point out that even a legally authorized detention or seizure of the person in the context of a traffic stop or even a *Terry* stop did not amount to custody within the contemplation of *Miranda.* Critical distinguishing factors were 1) that even the legally compelled stop would only last a little while and then the detainee would be free to go upon his way and 2) that the stop was frequently in public or in the presence of friends and relatives and was by no means the "incommunicado" situation calling for the strong antidote of *Miranda.*

An illuminating contrast may be made between the September 6 interview of the appellant and a typical *Terry* stop-and-frisk situation. Here, the appellant was not under any restraint at all. Here, the appellant was entitled not to speak to the policeman at all. Here, the appellant was entitled to terminate the interview at any time he chose. In a stop-and-frisk situation, the detainee is not free to leave

but must stand and be questioned. The detainee, moreover, may be subjected to a head-to-toe frisk for weapons. Even that far more restrictive situation, however, is not "custodial" so as to require the giving of *Miranda* warnings. *Berkemer v. McCarty* explained, at 468 U.S. 439–440, at 104 S.Ct. 3150:

"[U]nless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*." (footnotes omitted).

In *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the Supreme Court was dealing with a situation where the suspect, as here, was being interrogated in a private home. The interrogators were two Special Agents of the Intelligence Division of the Internal Revenue Service. In holding that the situation was simply not custodial within the contemplation of *Miranda*, the Supreme Court reiterated the extreme and overbearing circumstances that *Miranda* was designed to counteract:

"The Court concluded that compulsion is 'inherent in custodial surroundings,' . . . and, consequently, that special safeguards were required in the case of 'incommunicado interrogation of individuals in a police-dominated atmosphere.'" (footnote and citations omitted).

425 U.S. at 345–346, 96 S.Ct. at 1616. The Court rejected Beckwith's claim that his stressful situation was somehow the functional equivalent of the custodial setting:

"Petitioner's argument that he was placed in the functional, and, therefore, legal, equivalent of the *Miranda* situation asks us now to ignore completely that *Miranda* was grounded squarely in the Court's explicit and detailed assessment of the peculiar 'nature and setting of . . . in-custody interrogation.'"

425 U.S. at 346, 96 S.Ct. at 1616. The Supreme Court further pointed out that the fact that the police have a strong case against the suspect and that the suspect is the

"focus" of the investigation does not transform a non-custodial setting into a custodial one:

"An interview with Government agents in a situation such as the one shown by this record simply does not present the elements which the *Miranda* Court found so inherently coercive as to require its holding. Although the 'focus' of an investigation may indeed have been on Beckwith at the time of the interview in the sense that it was his tax liability which was under scrutiny, he hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding."

425 U.S. at 347, 96 S.Ct. at 1616.

In *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), a burglary suspect was actually invited to come to the police station, where he sat across a desk from his interrogator behind closed doors. The police interrogator, moreover, falsely stated that the suspect's fingerprints had been found at the burglary scene. At the end of the interrogation, however, the suspect was not arrested and was released. The Oregon Supreme Court reversed a subsequent conviction, holding that "the interrogation took place in a coercive environment of the sort to which *Miranda* was intended to apply." The Supreme Court of the United States reversed, holding that the situation was non-custodial:

"[T]here is no indication that the questioning took place in a context where respondent's freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½ hour interview respondent did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody 'or otherwise deprived of his freedom of action in any significant way.' "

429 U.S. at 495, 97 S.Ct. at 714. The Supreme Court further explained that the stress, guilt and anxiety inherent in every situation where a suspect is being interrogated by those who believe him guilty of crime does not add up to the

functional equivalent of compulsion represented by custodial interrogation:

> "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question."

429 U.S. at 495, 97 S.Ct. at 714.

A compulsory summons to appear and to testify before a grand jury is far more coercive than the home interview conducted in this case. Even with respect to that degree of compulsion, however, *United States v. Mandujano*, 425 U.S. 564, 580, 96 S.Ct. 1768, 1778, 48 L.Ed.2d 212, 224 (1976), made it clear that that was not custodial within the contemplation of *Miranda* and that *Miranda* was aimed at pressures of a far more daunting and quite different quality:

> "Indeed, the Court's opinion in *Miranda* reveals a focus on what was seen by the Court as police 'coercion' derived from 'factual studies [relating to] police violence and the "third degree" ... physical brutality—beating, hanging, whipping—and to sustained and protracted questioning incommunicado in order to extort confessions....' ... To extend these concepts to questioning before a grand jury inquiring into criminal activity under the guidance of a judge is an extravagant expansion never remotely contemplated by this Court in *Miranda*." (citations omitted).

For a thorough review of many of the various factors that bear upon the issue of custody, *see Cummings v. State*, 27 Md.App. 361, 369–381, 341 A.2d 294 (1975).

The September 6 interview by Corporal Norman of the appellant at the appellant's home was not remotely custodial in nature. *Miranda*, under the circumstances, was completely inapplicable.

*Due Process:*

*Pre–Miranda Voluntariness*

 In conducting a dogged defense in depth, the appellant argues additionally that even if *Miranda* and the Fifth Amendment privilege were not violated, there was nonetheless a violation of general due process under the pre-*Miranda* regime of involuntariness. The appellant's effort is flawed in two respects.

A. *The General Flaw:*

At the more general level, the appellant invites us to employ a frame of analysis that was essentially replaced by the Supreme Court 25 years ago in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as being too cumbersome and time-consuming. In 1936, *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, reviewed for the first time the constitutionality of a challenged confession coming out of a state court. It did so under the due process clause of the Fourteenth Amendment. Between then and 1964 [1] it considered approximately 35 state confession cases, placing exclusive reliance on the due process clause. What emerged was the so-called "voluntariness" test, which found ultimate expression in *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057–1058 (1961):

"The ultimate test remains that which has been the only clearly established test in Anglo–American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it

---

1. Within a year after *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) incorporated the Sixth Amendment right to counsel into the due process clause, *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) added a right-to-counsel violation to the arsenal of constitutional challenges to the admissibility of confessions. The limited utility of that weapon, however, is that it, like all Sixth Amendment rights, is available only to one who has achieved the status of being "the accused."

may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

That development paralleled developments in the federal courts. Whereas the criterion for determining inadmissibility in a state trial was involuntariness within the contemplation of the due process clause, the counterpoint criterion for determining inadmissibility in a federal trial was compulsion within the contemplation of the Fifth Amendment privilege. *Bram v. United States,* 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897).

A doctrinal marriage was made in 1964 when the Supreme Court overturned half a century of precedents and held that the Fifth Amendment privilege was incorporated into the Fourteenth Amendment. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). Although *Malloy v. Hogan* did not itself deal with a confession, it supported its incorporation argument by pointing out that a large part of the Fifth Amendment privilege, that prohibiting compelled confessions, was already applicable to the states by virtue of the Fourteenth Amendment's ban upon involuntary confessions:

"[T]oday the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897, when, in *Bram v. United States* ... the Court held that '[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States commanding that no person "shall be compelled in any criminal case to be a witness against himself." ' " (citation omitted).

378 U.S. at 7, 84 S.Ct. at 1493. It was clear that a compelled confession according to the Fifth Amendment and an involuntary confession according to the Fourteenth Amendment were one and the same:

"Under this test, the constitutional inquiry is not whether the conduct of state officers in obtaining the confession was shocking, but whether the confession was 'free and voluntary.' ... In other words the person must not have been compelled to incriminate himself." (citations omitted).

378 U.S. at 7, 84 S.Ct. at 1493.

At the next available opportunity following the doctrinal marriage, *Miranda v. Arizona* moved the great bulk of constitutional confession law under the Fifth Amendment umbrella. At the most basic level, *Miranda* accomplished two things. The testimonial privilege, long a familiar fixture in the courthouse, had been massively moved out to the station house. Whereas the implementation of that privilege had been a comfortable tradition in the courthouse, with lawyers and judges and clerks and 200 years of precedent habituated to their implementing roles, implementation in the strange, new setting was problematic. Without the familiar cast of implementing personnel on hand at the station house, it fell to the lot of *Miranda* to perform their role in the new and untraditional locale.

In the course of implementing the privilege, *Miranda* served a second function as well. It was deliberately designed to substitute a quick and efficient litmus paper test for what had become an interminable adjudicative nightmare. In either the linguistic tradition of involuntariness or the indistinguishable linguistic tradition of compulsion, the state of the confessor's mind had been assessed according to the totality of the circumstances. That totality approach committed the suppression hearing judge to the seemingly endless consideration of age, I.Q., competence, sanity, psychological makeup, childhood, prior criminal experience, giving or withholding of warnings, state of custody, availability of visitors, access to telephone, place and duration of interrogation, *et cetera ad infinitum*. *Miranda* sought to curtail that time-consuming exercise by giving a defendant the benefit of a bright line formula. The simple establishment of custody and interrogation would give rise to the

presumption of compulsion (for Fifth or Fourteenth Amendment purposes) and require the therapeutic benefits of the *Miranda* catechism. *Miranda* made it easier to prove compulsion or involuntariness, not more difficult.

To the extent to which *Miranda*'s custodial interrogation and traditional involuntariness are not coterminous concerns, traditional involuntariness invariably contemplates a degree of malevolence and coercive influence that goes beyond the presumptive coercion of custodial interrogation, not something that falls short of it. Thus, for instance, a violation of only *Miranda*'s implementing rule—a "mere *Miranda*" violation—although calling for the suppression of the confession on the merits of guilt or innocence, does not trigger second-level suppression under the "fruit of the poisonous tree" doctrine. *Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), or preclude the use of the *Miranda*-violative statement for impeachment purposes. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). When the unconstitutional cut, on the other hand, goes deep enough to touch the raw central nerve of the undergirding constitutional guarantee itself, the offending statement may not be used for any purpose at all. *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). *And see Kidd v. State*, 33 Md.App. 445, 366 A.2d 761 (1976); *State v. Kidd*, 281 Md. 32, 375 A.2d 1105 (1977).

What the appellant here seeks to do is to take that relationship between the greater fault (involuntariness) and the lesser fault (a *Miranda* violation) and to turn it inside out. From several unexceptionable precedents establishing that an instance of true involuntariness may be more grievous than a *Miranda* violation, he leaps to the opposite conclusion that there may be instances of involuntariness not amounting to a *Miranda* violation. While that may be possible, that coercion or inducement can occur after the

*Miranda* procedure is completed, there is no indication of that occurring here.

The appellant invites us to abandon the "bright line" virtues of *Miranda*'s easily administered test and to return to. the interminable adjudicative nightmare of the pre-*Miranda* "totality of circumstances" regime. This would undo, in major measure, the uniformity and the administrative efficiency that *Miranda* was designed to accomplish and has accomplished. For reasons of policy alone, the appellant's invitation must be declined.

B. *The Specific Flaw:*

 Even if we were to accept, however, the appellant's invitation to assess voluntariness under circumstances not amounting to a *Miranda* violation, the exercise would yield the appellant nothing.

In constructing his argument in this regard, the appellant has culled, highly selectively, isolated sentences and phrases from four or five pre-*Miranda*, voluntariness cases and artfully woven them together so as apparently to cover his situation *vis-a-vis* Ms. Meyer and Corporal Norman. "There is torture of mind as well as body; the will is as much affected by fear as by force," *Payne v. Arkansas,* 356 U.S. 560, 566, 78 S.Ct. 844, 849, 2 L.Ed.2d 975 (1958); "[N]either the body nor mind of an accused may be twisted until he breaks," *Culombe v. Connecticut,* 367 U.S. 568, 584, 81 S.Ct. 1860, 1869, 6 L.Ed.2d 1037 (1961); "[T]he product of coercion, either physical or psychological cannot stand," *Rogers v. Richmond,* 365 U.S. 534, 540, 81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961); "[T]he blood of an accused is not the only hallmark of an unconstitutional inquisition." *Blackburn v. Alabama,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1959).

Far from establishing instances of involuntariness under circumstances less coercive than *Miranda*'s custodial interrogation, each of these cases involves the very danger of custodial interrogation that *Miranda* was designed to coun-

ter. In *Payne v. Arkansas,* a 19–year–old with a fifth-grade education was held incommunicado for over 48 hours, without counsel and without permission to make a telephone call, and was warned by the Chief of Police that a potential lynch mob of thirty to forty people was gathering outside and that the Chief's protective intervention was contingent upon the suspect's confessing. In *Culombe v. Connecticut,* the suspect, in police custody, was accosted by teams of interrogating officers over a period of ten days. In *Rogers v. Richmond,* the suspect was transported from the jail to the State's Attorney's Office, was interrogated by a team of three policemen for approximately nine hours, and was threatened that his wife would be arrested if he did not confess. In *Blackburn v. Alabama,* the suspect, under arrest, was interrogated by three policemen for between eight and nine hours in closely confined quarters—a room measuring, at most, six feet by eight feet.

Had the interrogations in these cases taken place after 1966, they would have represented clear-cut violations of *Miranda v. Arizona.* It is, therefore, impossible to cite them, as the appellant does, for the proposition that the appellant's non-custodial, non-*Miranda*-violative interview with Corporal Norman nonetheless overbore his will to resist. Clearly, the circumstances of the appellant's home interview in this case do not come close to establishing that his incriminating statements were involuntary within the traditional contemplation of the due process clause.

### Maryland Violations

■ The appellant now claims, for the first time on appeal, that the introduction of his incriminating statements violated, *inter alia,* Articles 22 and *24* of the Maryland Declaration of Rights. At the outset, we will assume that his second constitutional citation is meant to be to Article 23, dealing with due process of law, and not to Article 24, dealing with slavery. The appellant also claims a violation of the Maryland common law.

Quite aside from the fact that Articles 22 and 23 are *in pari materia* with their respective federal counterparts, the Fifth Amendment privilege against compelled self-incrimination and the Fourteenth Amendment guarantee of due process of law, the short answer is that nothing in this regard was ever raised before the trial court. No mention of alleged violations of Maryland law was made in the course of the suppression hearing and the suppression judge, therefore, was never called upon to make a ruling in that regard.

The Motion to Suppress itself was an omnibus motion dealing with search and seizure issues, with confessions, and with pretrial identification. The total content of the Motion with respect to confessions was:

"2. That all admissions, statements, or confessions of the defendant be suppressed because they were obtained unlawfully, involuntarily, forcibly, and in violation of the defendants Constitutional and other legal rights."

Stapled to the Motion was a single page entitled "Points and Authorities." It listed the following:

"*U.S. Constitution*

*Maryland Declaration of Rights,*"

without any more specific citation to any section of either document. It then catalogued 38 cases, federal and state, covering a range of constitutional topics, embracing somewhat over 800 pages of case law, focusing on none of those 800 or more pages in particular and referring to no specific principle of law covered by any of those 38 opinions.

The suppression hearing judge was not called upon, by the most strained analysis or attenuated reasoning, to render any decision with respect to either Article 22 or Article 23 of the Maryland Declaration of Rights or with respect to Maryland common law. Presiding over the suppression hearing was Judge Raymond E. Beck, Jr. At the end of that hearing, Judge Beck ruled that the various incriminating statements were admissible in evidence.

At the outset of the trial on the merits before Judge Gilmore, the appellant never sought to have the suppression issue reconsidered or relitigated. When Corporal Norman introduced the tape recording of his September 6 interview with the appellant, no defense objection was made.

It was only at the end of the entire case, as the appellant was moving for a judgment of acquittal, that he entered into a rambling and undifferentiated rehash of Judge Beck's failure to suppress the statements, of the failure of the court to dismiss the indictments, and of the failure of the court to rule that the two daughter-victims should not have been allowed to testify. It was in the course of this ramble that a passing allusion was first made to Maryland law. Quite aside from other inadequacies, it came too late. There was never any suggestion that Judge Gilmore was opening those issues up for reconsideration at that late hour. He simply announced, with some resignation, "All of your motions are denied." We do not deem the appellant's eleventh-hour allusions or references to long settled issues to be an adequate revival or preservation of them for appellate review.

JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.