483 A.2d 363

**In re SHANNON A.**

**No. 60, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Nov. 9, 1984.

400

Barbara Matthews, Assigned Public Defender, with whom was Alan H. Murrell, Public Defender, on the brief, for appellant.

Zvi Greismann, Asst. Atty. Gen., with whom were Stephen H. Sachs, Atty. Gen., Warren B. Duckett, Jr., State's Atty., Anne Arundel County, and Cynthia Ferris, Asst. State's Atty., Anne Arundel County, on the brief, for appellee.

Argued before MOYLAN, WILNER and BLOOM, JJ.

BLOOM, Judge.

The Circuit Court for Anne Arundel County, after an adjudicatory hearing on November 21, 1983, determined the appellant, Shannon A., to be a delinquent child. The court found that Shannon had committed acts which, if committed by an adult, would have constituted the crimes of manslaughter, assault and battery, and illegal use of a handgun. Following a disposition hearing on December 16, 1983, the court placed Shannon on probation under supervision of the Department of Juvenile Services and, among other conditions of probation, ordered him to perform 1000 hours of community services providing physical therapy to a brain-damaged child.

Appealing from that order, appellant raises the following issues:

1. Did the hearing judge err in denying appellant's motion to suppress statements made to Officer Malloy and Detective Moore?

2. Did the hearing judge err in admitting testimony at the adjudicatory hearing as to the results of a polygraph examination?

3. Did the hearing judge err in imposing 1000 hours of community service as a condition of probation?

We will answer "No" to all three questions and affirm the circuit court's order.

## FACTS

On August 11, 1983, appellant, then 13 years old, his sister Tracey, 10, and Jeffrey Talbot, 10, were playing at appellant's house in Millersville, Anne Arundel County. Neither of appellant's parents was at home. At approximately noon on that day, the paramedic unit of the fire department responded to a call at appellant's home where they found young Jeffrey outside on the lawn bleeding profusely. Jeffrey was transported to the hospital and pronounced dead at 4:14 p.m.; his cause of death was later determined to be a gunshot to the head.

After the paramedics arrived at the hospital, they notified their central dispatcher, who in turn notified the police, that a possible shooting had occurred. Several officers arrived on the scene around 1:00, among them Officer Malloy, a neighbor of appellant. Officer Malloy spoke to Shannon outside of the house and asked him what had happened. Another officer spoke with appellant's sister. Shannon told Malloy that Jeffrey had fallen and hit his head on a chest of drawers. Shannon then showed Malloy the bedroom in which Jeffrey was hurt. Shannon's mother returned home, and by this time a crowd of neighbors had gathered. Malloy took Shannon and his mother into his squad car to discuss the incident more privately.

Shortly thereafter, Malloy was notified by one of the other officers present that a bullet had been recovered from Tracey's bedroom. Malloy informed appellant that physical evidence had been located which contradicted his story. Shannon then broke down and amended his story. He

claimed that he had found a gun in his parents' bedroom while cleaning, that the gun had accidentally cocked, and that he and Jeffrey were trying to uncock it when the gun went off. Two guns, one of which was loaded, were subsequently retrieved from the bedroom of appellant's parents.

Around 3:30 that afternoon, appellant was taken to the Winterrode Building in Crownsville for further questioning. His mother and sister were present in the building during the inquiry, as was his father who arrived later. Appellant was then advised of his rights by Detective Moore. He initialled the standard *Miranda* form utilized by the police department, indicated to Detective Moore that he understood the rights explained to him, and stated that he had no questions about them. Moore also asked Shannon if he wanted to answer questions without an attorney present, and Shannon agreed.

Appellant was then given a polygraph examination by Detective Moore. Apparently Shannon repeated the story he had given to Officer Moore and Officer Malloy earlier, that the gun had accidentally cocked and the two boys were trying to disengage the hammer when the gun discharged. Moore turned off the machine and explained the difficulties with Shannon's story—namely, that a gun such as the one which killed Jeffrey could not accidentally cock. While the polygraph machine was still turned off, appellant changed his story again and told Moore that he went into his parents' bedroom, got the gun, cocked it intentionally, took it back into his sister's room where Jeffrey and Tracey were playing, pointed it at Jeffrey and it fired. At no time during the questioning did Shannon ask to speak to an attorney or his mother or father.

On November 21, 1983, a motion to suppress statements made by Shannon to Officer Malloy and Detective Moore was denied by the presiding judge. The judge determined that the statement to Malloy was made before appellant was in custody and that the statement to Moore was made after appellant had waived his *Miranda* rights. At the

adjudicatory hearing, which immediately followed the suppression hearing, the statements to Moore and Malloy were admitted into evidence. Shannon did not testify at this hearing.

## I. SUPPRESSION

### A. *Statement to Officer Malloy*

Appellant asserts initially that the determination by the presiding judge to admit the statement made to Officer Malloy was error. Specifically, he contends that the statement's admission violated appellant's constitutional right against self-incrimination, as Shannon had not been given his *Miranda* warnings at the time he spoke to Malloy.

The threshold question in any case where there is a purported *Miranda* violation is a determination of whether the questioned party was in custody. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If there was a custodial interrogation and no warnings were given, then any statement made by the suspect is excluded from evidence. When the subject answers questions while not in custody, such statements may be admitted even if no *Miranda* rights were accorded. *Id.*

The Court of Appeals discussed the question of what constitutes custody in *Whitfield v. State,*[1] 287 Md. 124, 411 A.2d 415 (1980). Quoting from *Myers v. State,* 3 Md.App. 534, 240 Md.App. 534 (1968), the Court explains the general test as follows:

> [C]ustody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted

---

1. *Whitfield* ultimately held that a statement made by a prisoner about the location of a gun in the jailhouse could not be admitted into evidence because the prisoner had not been given his *Miranda* rights when he made the statement. Thus, the Court of Appeals denied the existence of an emergency exception to *Miranda* in Maryland. *N.Y. v. Quarles,* 467 U.S. ——, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), however, appears to overrule *Whitfield sub silentio* as *Quarles* holds statements made prior to *Miranda* warnings are admissible if the police are asking the questions to protect the safety of the public.

of his freedom of action or movement under pressures of official authority. \* \* \* [T]he custody requirement of *Miranda* does not depend on the subjective intent of the law enforcement officer-interrogator but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation. \* \* \*

*Whitfield* 287 Md. at 140, 411 A.2d 415.

■ Factors are enunciated in *Whitfield* that should be considered by the court in resolving the issue of whether or not there was custody for purposes of *Miranda*. These factors include:

those facts intrinsic to the interrogation: when and where it occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, and whether the defendant was being questioned as a suspect or as a witness. Facts pertaining to events before the interrogation are also relevant, especially how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers. Finally, what happened after the interrogation—whether the defendant left freely, was detained or arrested—may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning. [*Hunter v. State*, 590 P.2d 888 at 895 (Alaska 1979) (footnote omitted).]

*Whitfield* at 141, 411 A.2d 415.

After the testimony was presented at the suppression hearing, the hearing judge decided that Shannon was not in custody when he first spoke to Officer Malloy because he was not a suspect at that time. On the facts in the record before us, we agree.

■ The police arrived at appellant's house after being notified of a "possible shooting." They had no tangible evidence when they arrived at the house that any crime had been committed; there was merely a vague notion that there had possibly been a shooting. The questioning of appellant by Officer Malloy, therefore, was more in the nature of "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process," *Miranda v. Arizona, supra,* 384 U.S. at 477, 86 S.Ct. at 1629, which does not require *Miranda* warnings to be admissible.

Officer Malloy simply asked appellant what had happened. Appellant's sister was similarly questioned by another officer. Suspicion clearly had not focused on appellant at the time he initially spoke with Malloy. This statement, that Jeffrey fell down and hit his head, was clearly admissible.

■ Shannon's second statement, to the effect that he accidentally found the gun, that he accidently cocked the gun and that the gun accidentally fired when he and Jeffrey were trying to uncock it, was made after Malloy told him that the police knew Jeffrey had been shot. By the time Shannon told the second story, it was fairly obvious that the police had reason to believe that Shannon was involved in the shooting of Jeffrey and it must have been evident to Shannon that he was suspected of something. Nevertheless, applying the various factors enumerated in *Whitfield,* we agree with the trial court's finding that Shannon was not in custody when he made the second statement.

The interrogation occurred at Shannon's own home with his mother present and was very brief. Although there were several police officers around, they were searching for evidence and the actual interrogation was conducted by Officer Malloy, a neighbor of Shannon. The boy was not handcuffed, shackled or otherwise physically restrained; there were no drawn guns or guards restricting his movements. Although it appears that there was at least one

policeman with him at all times, Shannon was not physically deprived of his freedom of action in any significant way. The question, therefore, is whether he was "led to believe, as a reasonable person, that he [was] being deprived of his freedom of action or movement under pressures of official authority." *Whitfield, supra,* 287 Md. at 140, 411 A.2d 415. Appellant never testified that he believed he was deprived of freedom of action or movement.

### B. *Statement to Officer Moore*

Appellant also contends that the statement he made to Detective Moore after a polygraph test, but with the machine turned off, should have been suppressed. In that statement, appellant asserted he had gotten the gun from his parents' bedroom, cocked it, pointed it at Jeffrey and it went off. Specifically, he argues that the statement, while made after *Miranda* warnings were issued, is inadmissible because it "was a product of unlawful police coercion." We disagree.

The case of *In Re Anthony F.,* 49 Md.App. 294, 431 A.2d 1361 (1981), is instructive on this point. In *Anthony,* a juvenile suspect was arrested and taken in for questioning. He was advised of his rights, acknowledged that he understood, and did not request a lawyer or family member to be present. Further, police officers testified that no promises were made to the juvenile. We held that the statement was indeed admissible, as "the State met its burden of showing that Anthony's statement 'was the product of a free and unconstrained will which had not been overborne or compelled.'" 49 Md.App. at 299, 431 A.2d 1361, quoting from *Walker v. State,* 12 Md.App. 684, 696, 280 A.2d 260 (1971).

The facts in the case before us are similar to the *Anthony* scenario. Once suspicion was focused on appellant, he was taken into custody for questioning. His mother was in the building during the inquiry and gave Detective Moore permission to question Shannon. Moore advised Shannon of his rights, by reading each individual right and asking if the boy had any questions. Moore also gave the

appellant the printed rights form to read himself. He asked again if there were any questions. Shannon then signed the form, and Moore proceeded with the questioning.

The investigation took several hours, but Shannon was given dinner, which he ate with his parents. Several breaks were taken as well during the procedure. There was also testimony that no promises were made to appellant during the questioning.

Based upon the record before us, we agree with the trial judge's determination that appellant's statement to Moore was voluntary. As in *Anthony,* we feel that the State met its burden of showing that appellant's statement "was the product of a free and unconstrained will...." *Walker, supra,* at 696, 280 A.2d 260. The appellant was read his rights, he read them again himself and then agreed to talk. Although appellant changed his story when Moore pointed out the inherent inconsistencies to him, we determine Shannon's conduct to be a voluntary, knowing and intelligent waiver of his *Miranda* rights. *Miranda v. Arizona,* 384 U.S. at 443, 86 S.Ct. at 1611.

█ Further, the fact that the appellant's statement was elicited between polygraph examinations does not automatically render the statement involuntary or unlawfully coerced. *Johnson v. State,* 31 Md.App. 303, 355 A.2d 504 (1976). The use of a polygraph is merely one element the finder of fact should consider in determining whether or not the statement was voluntarily given. The judge in a bench trial must decide whether the use of the polygraph was "a mere motivating factor, but [he] may also determine that it had so coercive an effect as to render a confession thus obtained involuntary. The decision is one for the fact finder alone...." *Johnson* at 306, 355 A.2d 504. We concur with the finding of the presiding judge that the statement to Moore "was given freely and voluntarily."

## II. POLYGRAPH TESTIMONY

Appellant has a second argument for exclusion of the inculpatory statement made to Detective Moore when the

polygraph machine was disengaged. Appellant maintains that admission of his statement to Moore indirectly conveys the results of the polygraph examination, and polygraph results in any form are inadmissible. *Kelley v. State,* 288 Md. 298, 418 A.2d 217 (1980).

■ While appellant is correct in asserting that polygraph results are inadmissible, it was appellant's counsel who first mentioned the word polygraph and brought out the fact that the statement to Moore was made between polygraph tests. Counsel elicited such testimony from Detective Moore on cross-examination at the suppression hearing. Appellant cannot complain that his own trial conduct constitutes error. "Appellate courts look only to the rulings made by a trial judge, or to his failure to act when action was required, to find reversible error." *Braun v. Ford Motor Co.,* 32 Md.App. 545, 548, 363 A.2d 562 (1976).

## III. PROPRIETY OF SENTENCING

■ At the disposition hearing, the court placed appellant on probation and enunciated five special conditions of probation. Among those special conditions was a requirement that Shannon perform 1000 hours of community service, under the supervision of Juvenile Services, in the form of working with a brain-damaged child in Severna Park, Maryland. Appellant contends that this aspect of the disposition was improper. We disagree.

Maryland Cts. & Jud.Proc.Code Ann. § 3–820 (1984) lists the options available to a judge at a juvenile disposition hearing. The statute controlling at the time of the disposition stated,[2] in part:

(c) In making a disposition on a petition, the court may:

(1) Place the child on probation or under supervision in his own home or in the custody or under the guardian-

---

**2.** This section was amended in July 1984, but the amendment is inapplicable to the issue before us.

ship of a relative or other fit person, upon terms the court deems appropriate;

(2) Commit the child to the custody or under the guardianship of the Juvenile Services Administration, a local department of social services, the Department of Health and Mental Hygiene, or a public or licensed private agency; or

(3) Order the child, parents, guardian, or custodian of the child to participate in rehabilitative services that are in the best interest of the child and the family.

Subsection (d) then provided:

(2) In addition to the dispositions under subsection (c)(1) of this section, the court also may:

(i) Counsel the child or the parent or both;

(ii) Impose a civil fine of not more than $25 for the first violation and a civil fine of not more than $100 for the second and subsequent violations;

(iii) Order the child to participate in a supervised work program for not more than 20 hours for the first violation and not more than 40 hours for the second and subsequent violations.

Appellant maintains that the disposition of this proceeding was made pursuant to § 3–820(c)(1) as Shannon was placed on probation and that 1000 hours of community service was one of the "terms the court deems appropriate" of that probation. Appellant further contends that § 3–820(d)(2)(iii) specifically provided an additional disposition to (c)(1) in the form of community service and the existence of § 3–820(d)(2)(iii) necessarily precludes an interpretation that community services may be one of the probationary terms generally imposable.

While appellant's argument is logical, we find that the 1000 hours of community service imposed on Shannon comes under the ambit of § 3–820(c)(3). Such service certainly may be viewed as "rehabilitative services that are in the best interest of the child...." The comments of the trial judge clearly indicate that he imposed the condition for

**412**

its rehabilitative effect, not as punishment. Accordingly, we affirm the disposition order.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.