788 A.2d 705

**Richard Albert BOND**

v.

**STATE of Maryland.**

**No. 653, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Jan. 8, 2002.

Sherrie B. Glasser, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Joseph I. Cassily, State's Atty. for Harford County, Bel Air, on the brief), for appellee.

Argued Before HOLLANDER, KENNEY and DEBORAH S. EYLER, JJ.

DEBORAH S. EYLER, Judge.

In this case we must decide whether Richard Bond, the appellant, was in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when three police officers entered his bedroom late at night and questioned him about a crime that had taken place a few hours before, and that witnesses said he had committed. In responding to the officers, the appellant made incriminating statements that ultimately were admitted into evidence by the State at his jury trial in the Circuit Court for Harford County, on charges of driving on a revoked license and failing to stop at the scene of an accident. After the appellant was found guilty on both counts, and was sentenced, he noted this appeal, contending that the circuit court erred in denying his motion to suppress the incriminating statements.

## FACTS AND PROCEEDINGS

The central events in this case took place on the night of April 20, 2000. That evening, the appellant was on the parking lot of the Perryman VFW in Harford County. He approached the entertainment director of the facility, Lewis Fletcher, and asked him to have some people move their cars so he could maneuver his large, white tractor trailer out of the parking lot.

Fletcher went inside the club and asked the disc jockey to make an announcement. A short while later, a woman ran inside the club from the parking lot, reporting that she had heard a crash. Fletcher returned to the parking lot where he

encountered witnesses who said the appellant had driven his tractor trailer out of the parking lot and had struck two vehicles in the process. Fletcher found two damaged cars, both of which were green. One of the cars had white and black paint transferred onto it. Fletcher then called the police.

Deputy Paul Neikirk responded to Fletcher's call. At the suppression hearing in this case, Deputy Neikirk was the sole witness. The following facts are gleaned from his testimony at that hearing.

The call from Fletcher to the police came in at 10:29 p.m., and was a report of a hit and run accident at the Perryman VFW. Deputy Neikirk went to the scene and upon arriving spoke with several victims and witnesses, including Fletcher. He also inspected the damaged vehicles on the parking lot and took photographs of them.

Some of the witnesses told Deputy Neikirk that the appellant had struck the vehicles as he was driving his tractor trailer off the parking lot. Fletcher supplied Deputy Neikirk with the appellant's name and the license tag number of his tractor trailer. Deputy Neikirk ran a driver's license check and found an address for the appellant in Aberdeen. Deputy Neikirk and several other uniformed police officers then went to the appellant's address, which was in a trailer park. They located the tractor trailer in a common area of the cul-de-sac near the appellant's trailer home. Deputy Neikirk inspected the tractor trailer and saw green paint transfer consistent with the damaged vehicles in the VFW parking lot. He also observed damage to both tires of the truck, also consistent with it having been involved in the collision. Deputy Neikirk took photographs of the damage to the tractor trailer.

Deputy Neikirk, another deputy sheriff, and an Aberdeen police officer then went to the appellant's trailer home and knocked on the door. It is not clear precisely when this occurred; when asked whether they went to the appellant's trailer before or after midnight, Deputy Neikirk responded that he could not remember. In any event, the officers

knocked on the appellant's door either late on the same night as the incident or in the early morning hours of the next day. The appellant's eleven year old nephew answered the door. Deputy Neikirk asked if the appellant was home, and the youth said he was in the bedroom. Deputy Neikirk then asked whether he could speak to the appellant and the youth responded by letting the officers in the trailer and walking them back to the bedroom.

The officers entered the doorway of the appellant's bedroom, and the appellant sat up in bed. The bedroom was lighted when the officers entered, although Deputy Neikirk could not recall whether the light already was on or whether the appellant turned it on. The appellant was in bed with his shirt off. He was not asleep. Deputy Neikirk identified himself and stood inside the doorway of the bedroom, at the foot of the bed. (The bedroom had one door.) The other officers stood one to the side of Deputy Neikirk and one behind him.

Deputy Neikirk told the appellant the officers were there "due to a hit and run accident that occurred at the Perryman VFW which [they were] advised that he was involved in." At first, the appellant denied any knowledge of the incident. The officers then said that witnesses at the scene had described the accident and had identified him as the driver. The officers also told the appellant about the damage they had observed to his tractor trailer. Eventually, the appellant admitted to having been present at the VFW parking lot that night and to driving away through the side lot of the establishment. He told the officers that if he hit any parked vehicles while exiting, he had not known it.

Throughout most of the period of questioning, the appellant remained in bed. According to Deputy Neikirk, at one point the appellant stood up to put on his shirt and perhaps a pair of pants; he then sat back down on the bed.

The appellant and his nephew were the only people in the trailer. The appellant told the officers he was responsible for his nephew, and that the boy's mother was at work. Officer

Neikirk told the appellant he was going to bring charges against him but was not going to arrest him right then because there would be no place to put the nephew and the child was too young to be left alone.

Deputy Neikirk and the other officers did not tell the appellant he was under arrest at the outset of the interview or as it was occurring. They did not advise the appellant of his *Miranda* rights, either orally or in writing, and did not tell him he was free to leave or did not have to speak with them. The appellant did not indicate that he wanted to leave and did not tell the officers he did not wish to hear what they had to say.

At the conclusion of the suppression hearing, the court denied the suppression motion, ruling as follows:

Frankly, I have had this kind of a situation before. I think the last time I had it was a six year old who let the police in. In that situation the individual had no problem telling the police, using some expletives deleted, to get the blank out of his house at which point the police turned around and left the house.

To decide whether this is a voluntary statement or not, whether this was custodial or not, the standard is to look at the totality of the circumstances. There is nothing wrong about an eleven year old allowing the police in. I understand that I wouldn't particularly care to be sitting in my bed and being interviewed by three policemen. But the testimony in this case is that the eleven year old let the policemen in, they went back and were investigating this incident, the lights were on in the bedroom, the Defendant is awake and sitting up in bed, he answers the questions, he doesn't tell them to leave.

Taking a look at all of this I do not see this as a custodial interrogation. I do not see where *Miranda* is applicable and I don't see anything that makes it involuntary. The Court will deny the motion.

The appellant was tried by a jury and found guilty of driving on a revoked license and failing to stop at the scene of

an accident. The court sentenced him to a term of two years with all but one year suspended, for the driving while revoked conviction, and to a consecutive, suspended, sixty-day sentence for the failure to stop at the scene of an accident conviction. The court also imposed four years' probation, $1,500 in fines, and $250 in restitution. The appellant then noted a timely appeal.

## DISCUSSION

The appellant contends that, on the undisputed facts as related by Deputy Neikirk at the suppression hearing, he was in custody, for purposes of *Miranda v. Arizona*, when the officers questioned him in his bedroom, and therefore the officers were required to advise him of his rights. Because the incriminating statements he made were elicited without his having been advised of his rights, they should have been excluded from evidence, and it was error by the motion court to rule otherwise. In advancing his contention, the appellant primarily relies on *Orozco v. Texas*, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969).

The State counters that *Orozco* is distinguishable, and that this Court's decisions in *Gantt v. State*, 109 Md.App. 590, 675 A.2d 581 (1996); *Reynolds v. State*, 88 Md.App. 197, 594 A.2d 609, *aff'd*, 327 Md. 494, 610 A.2d 782, *cert. denied*, 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993); and *In re Shannon A.*, 60 Md.App. 399, 483 A.2d 363 (1984), *cert. denied*, 302 Md. 570, 489 A.2d 1129 (1985), support the motion court's ruling in this case. It also argues that if the motion court erred, the error was harmless.

Our review of a circuit court's denial of a motion to suppress evidence is limited to the record developed at the suppression hearing. *Wengert v. State*, 364 Md. 76, 84, 771 A.2d 389 (2001). We consider the facts as found by the motion court and the reasonable inferences from those facts in the light most favorable to the State, as the prevailing party. *Cartnail v. State*, 359 Md. 272, 282, 753 A.2d 519 (2000); *Ferris v. State*, 355 Md. 356, 368, 735 A.2d 491 (1999). Issues

of law and mixed questions of law and fact are reviewed *de novo*. *Cartnail, supra,* at 282, 753 A.2d 519. In addition, whether, on the facts as found by the motion court, or on the undisputed facts, the defendant was in custody for purposes of *Miranda v. Arizona,* is a question of law. *See, e.g., Berkemer v. McCarty,* 468 U.S. 420, 441, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (holding that on the facts as stipulated by the parties, the defendant was not in custody for purposes of *Miranda* when he was questioned by the police). When the request to suppress evidence was based on an allegation of the violation of a constitutional right, we perform our own constitutional appraisal. *See Ornelas v. United States,* 517 U.S. 690, 697–99, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

In the landmark *Miranda v. Arizona* case, the Supreme Court held that an accused's statement, made during "custodial interrogation," may not be used against him at trial unless he first was advised of his right to remain silent, that any statement by him could be used against him in court, that he was entitled to the presence of an attorney, and that if he could not afford an attorney one would be appointed for him if he so desired. While the Court did not interpret the Fifth Amendment in reaching its decision, the objective of the decision was to guard the accused's Fifth Amendment right against self-incrimination in a particular situation—"custodial interrogation"—that by its nature tends to compel self-incrimination. The Court sought to accomplish that goal pragmatically, by establishing as a procedural safeguard a rule of advisement or exclusion that must be employed to protect the Fifth Amendment privilege, unless other fully effective means are adopted to do so. *Argueta v. State,* 136 Md.App. 273, 279, 764 A.2d 863, *cert. denied,* 364 Md. 142, 771 A.2d 1071 (2001).

In the case at bar, there is no dispute that the interaction between the three officers and the appellant was an interrogation. The dispute is over whether the appellant was "in custody" when the interrogation took place, and therefore, under the rule of *Miranda,* had to be advised of his rights for any statement elicited in the interrogation to be admissible into evidence.

 In *Miranda*, the Court explained that a person is in custody either when he actually has been taken into custody by the police or there has been such a restriction on his freedom as to amount to being in custody. 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. "In determining whether an individual was in custody [when he was questioned], a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a "formal arrest or restraint of freedom of movement" of the degree associated with a formal arrest.'" *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977))). Accordingly, the issue of custody is to be decided under an objective standard, *i.e.*, "how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Furthermore, the decision whether the accused was in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, *supra*, at 323, 114 S.Ct. 1526.

 Recently, in *Argueta v. State*, we explained, for purposes of *Miranda:*

> [C]ustody occurs if a suspect is led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority. * * * The custody requirement of *Miranda* does not depend on the subjective intent of the law enforcement officer-interrogator but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such interrogation.

136 Md.App. at 283, 764 A.2d 863 (quoting *Myers v. State*, 3 Md.App. 534, 537, 240 A.2d 288 (1968) (quoting *People v.*

*Hazel,* 252 Cal.App.2d 412, 60 Cal.Rptr. 437 (1967))). Factors relevant to whether a person was in custody when he was interrogated by the police include when and where the interrogation occurred, its length, the number of police officers present, what the officers and the suspect said and did, whether the suspect was physically restrained, whether there was a show of force, *i.e.,* weapons drawn or a guard at the door, and whether the suspect was being questioned as a suspect or as a witness. *Whitfield v. State,* 287 Md. 124, 141, 411 A.2d 415 (1980). Events preceding and following the interrogation also are relevant to whether it was custodial: how the suspect got to the place of questioning, and whether he left freely thereafter or was detained or arrested. *Id.* These factors "may assist the court in determining whether the defendant, as a reasonable person, would have felt free to break off the questioning." *Id. See also Pennsylvania v. Bruder,* 488 U.S. 9, 10, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988) (noting that factors relevant to whether questioning amounts to "custodial interrogation" are the location of the interrogation, whether the suspect is sequestered or held incommunicado, the number of police officers present, and the duration of the interrogation).

In *Orozco v. Texas, supra,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), the Court addressed, for the first time, whether an accused individual was in custody, for purposes of *Miranda,* when he was interrogated by police officers in his home. In that case, witnesses reported that late on the night in question, the defendant shot the victim and killed him in the course of an argument. The defendant left the scene of the crime and returned to the boardinghouse where he was living, to sleep. At about 4 a.m., four police officers arrived at the boardinghouse and were let in by an unidentified woman. They were told the defendant was asleep in his bedroom, and were shown where it was. The officers all entered the defendant's bedroom, and began to question him. According to the officers, from the moment the defendant stated his name, he was not free to go where he pleased and was "under arrest." *Id.* at 325, 89 S.Ct. 1095. The defendant gave incriminating

answers to the officers' questions. At the defendant's trial, he sought to exclude from evidence the statements he had made to the police, on the ground that he had not been given the *Miranda* advisements. The trial court denied his motion.

A majority of the Supreme Court reversed, holding that the defendant had been in custody when he was questioned by the police in his boardinghouse bedroom, and the statements he gave them therefore were not admissible into evidence because he had not been given his *Miranda* warnings. The majority explained:

> It is true that the Court did say in *Miranda* that "compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery." 384 U.S., at 461, 86 S.Ct. 1602. But the opinion iterated and reiterated the absolute necessity for officers interrogating people "in custody" to give the described warnings. According to the officer's testimony, [the defendant] was under arrest and not free to leave when he was questioned in his bedroom in the early hours of the morning. The *Miranda* opinion declared that the warnings were required when the person being interrogated was "in custody at the station *or otherwise deprived of his freedom of action in any significant way.*" 384 U.S., at 477, 86 S.Ct. 1602. (Emphasis supplied).

394 U.S. at 326–27, 89 S.Ct. 1095 (internal citation omitted). Two dissenters argued that the decision "carrie[d] the rule of *Miranda* . . . to a new and unwarranted extreme," *id.* at 328, 89 S.Ct. 1095, by applying it outside the stationhouse and in the familiar surroundings of a person's home. *Id.* at 328–30, 89 S.Ct. 1095.

The Supreme Court revisited the issue of whether a person questioned in his own home can be "in custody," for purposes of *Miranda,* in *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). In that case, after two special agents of the Internal Revenue Service had conducted an investigation of the defendant, they went to see him at a

private home in which he was staying. The agents arrived at the home at 8 a.m., identified themselves to the person answering the door, and asked to speak to the defendant. They were invited into the house. The defendant entered the room in which the agents were waiting, and they introduced themselves to him. He then left the room for about five minutes, "to finish dressing." 425 U.S. at 343, 96 S.Ct. 1612. Thereafter, the defendant sat down at the dining room table with the agents. They presented their credentials, explained that part of their duties was to investigate possible criminal tax fraud and that they were investigating his tax liability for certain years. They then advised him that, "Under the Fifth Amendment to the Constitution of the United States, [they could] not compel [him] to answer any questions or to submit any information if such answer or information might tend to incriminate you in any way." *Id.* The agents also advised the defendant that anything he might say could be used against him in a criminal proceeding, and that if he wished, he could seek the assistance of an attorney before answering their questions.

The defendant acknowledged understanding what the agents told him and then participated in an interview for three hours. The agents described the atmosphere of the interview as "friendly" and "relaxed," and the defendant testified that the agents did not "press" him on any question he could not or chose not to answer. At the end of the interview, the agents asked whether the defendant would permit them to inspect certain documents that were kept at his place of employment. He agreed, and they traveled separately to the place of employment, meeting there about 45 minutes after the interview.

The Supreme Court, holding that the defendant had not been "in custody" when he was questioned by the agents, affirmed the trial court's decision not to suppress the statements made by the defendant for having been given without the benefit of full *Miranda* warnings. The Court found that there was no "compulsive aspect" to the questioning in the case, *id.* at 348, 96 S.Ct. 1612, and the circumstances of the

interview by government agents, "simply d[id] not present the elements which the *Miranda* Court found so inherently coercive as to require its holding." *Id.* at 347, 96 S.Ct. 1612.

Another Supreme Court case that, while not involving police interrogation in the home, is instructive in determining when an interrogation is "custodial," is *Berkemer v. McCarty, supra,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317. In that case, the Court held that the roadside questioning of a motorist detained pursuant to a routine traffic stop did not constitute "custodial interrogation" for purposes of the rule of *Miranda.* The Court observed that the rule of *Miranda* is to be "enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated ... [that is, in situations that] exert[ ] upon a detained person pressure that sufficiently impair[s] his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." 468 U.S. at 437, 104 S.Ct. 3138.

In reasoning that an ordinary traffic stop is not such a situation, the Court found several factors significant. Because traffic stops usually are temporary and brief, they offer little opportunity for the coercion that can be brought about by the mere open-endedness of an interrogation. In addition, the average citizen has an understanding of what a traffic stop will entail; it is not an utterly unexpected occurrence in the life of an ordinary person. Also, a traffic stop is at least to some degree public, and therefore not a situation in which the detained motorist "feels completely at the mercy of the police." *Id.* at 438, 104 S.Ct. 3138. The semi-public nature of the stop, and the fact that the motorist "typically is confronted by only one or at most two policemen" outweighs the "sense of vulnerability" the situation engenders. *Id.* "In short, the atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself ... and in the subsequent cases" in which the Court applied *Miranda,* including *Orozco. Id.* at 438–39, 104 S.Ct. 3138. The Court concluded that the typical traffic stop is much more like a

*Terry* stop, *see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), than like a formal arrest, and explained that the

> comparatively nonthreatening character of detentions of [the *Terry* ] sort explains the absence of any suggestion in [its] opinions that *Terry* stops are subject to the dictates of Miranda. The similarly noncoercive aspect of ordinary traffic stops prompts [the Court] to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda.*

468 U.S. at 440, 104 S.Ct. 3138.

◼ Returning to the case at bar, we must determine, from an objective standpoint, and keeping in mind the underlying purpose of the *Miranda* decision, whether there was a coercive aspect to the circumstances in which the appellant was questioned, so as to constitute custodial interrogation. We conclude that the factors relevant to this analysis point strongly in favor of the appellant being in custody when he was questioned by Deputy Neikirk in the bedroom of his trailer home.

The interrogation in this case took place late at night in the appellant's bedroom, with the appellant in bed and partially clothed. To be sure, the questioning did not occur in the potentially coercive atmosphere of a police station, or of a strange and unfamiliar location. It ran to the other extreme, however. Whether the appellant was awake or asleep when the officers entered his bedroom, the highly private location of the interrogation, the late hour, the appellant's state of undress, the number of officers present, and the accusatory nature of the questioning were such that an ordinary person in the circumstances would be intimidated, and would not think he could end the encounter merely by telling the officers to leave.

The interrogation in this case was the polar opposite of the questioning that accompanies a traffic stop, which is expected, takes place in a public or semi-public place, and is mutually understood to be brief. The ordinary person does not expect

his friends or neighbors, let alone police officers, to appear in his bedroom late at night. There is a world of difference between a person being questioned during normal daytime hours, at his dining room table, in a relaxed atmosphere (such as in *Beckwith* ), and a person being questioned late at night, in bed, undressed, by three officers blocking the bedroom door (as in this case). Moreover, unlike the routine traffic stop, which is a "known quantity" to most people, the unusual nature of the interrogation in this case was such that the appellant would have had no way of gauging how long the questioning was going to continue. The atmosphere in which the interrogation in this case was conducted was one of pressure, accusation, and uncertainty that would lead a reasonable person to believe that silence was not an option.

■ The case at bar differs somewhat factually from *Orozco* in that, in that case, the defendant was informed that he was under arrest when the officers entered his bedroom.[1] In this case, Deputy Neikirk and his associates did not tell the appellant he was under arrest, although they intended to arrest him, and would have done so, were it not for the fact that the appellant's eleven year old nephew would have been left unattended. To be sure, the subjective intentions of the officers, and the subjective perception of the appellant, were not relevant to whether the appellant was in custody. *Stansbury, supra,* 511 U.S. at 323, 114 S.Ct. 1526. We think, however, that the total circumstances of the interrogation were such that a reasonable person would have thought and expected that his freedom of action was being restricted while he was being questioned, whether or not the encounter in fact concluded with his being physically taken into custody.

The cases relied upon by the State to support its position that the appellant was not in custody when he was questioned

---

1. Actually, the body of the opinion in *Orozco* does not recite that fact. It is included in the syllabus, which is not part of the opinion. That fact has been emphasized by the Court, however, in later cases citing *Orozco. See Berkemer v. McCarty, supra,* 468 U.S. at 439 n. 28, 104 S.Ct. 3138.

by the officers are distinguishable. In *Gantt v. State,* 109 Md.App. 590, 675 A.2d 581 (1996), a police officer responded to a non-specific call about a disturbance at the defendant's house. He was let in, and was approached by several people, "all attempting to talk to him at once." 109 Md.App. at 593, 675 A.2d 581. The appellant was sitting in a chair in the middle of the living room, and was the quietest person there. The officer, who did not know the reason for the call to the house and only was trying to ascertain what had occurred, walked up the appellant and asked him what was going on. The appellant responded by saying, " 'She wouldn't listen to me so I was choking her.' " *Id.* at 594, 675 A.2d 581. After charges were brought against the defendant for child abuse, he moved to suppress that statement, as having been given without *Miranda* warnings. We held that the statement was not the product of custodial interrogation.

The only common thread between *Gantt* and the case at bar is that the "questioning" by the police took place in the defendant's home. In *Gantt,* unlike in this case, the police officer went to the defendant's house to look into a vague report of disturbance-not to question the defendant as a suspect in a crime. Indeed, the officer did not know that a crime had occurred. He posed a general, non-accusatory, single question to the defendant only for the purpose of determining why he had been called to the house in the first place. None of the indicia of custody that existed in this case were present in *Gantt.*

The State also relies on *Reynolds v. State,* 88 Md.App. 197, 594 A.2d 609, *aff'd,* 327 Md. 494, 610 A.2d 782, *cert. denied,* 506 U.S. 1054, 113 S.Ct. 981, 122 L.Ed.2d 134 (1993). In that case, the defendant's grown daughters had accused him of sexually abusing them when they were children. The defendant sought counseling, which resulted in his being reported to the appropriate law enforcement authorities. He was told this would happen, and had consented to it at the outset of counseling. A police officer was assigned to investigate the matter. By consent, and accompanied by a mental health counselor, the defendant met with the officer, who read him

his rights. The defendant then told the office he should speak to the daughters about the allegations, and gave the officer their names and addresses.

The officer contacted the defendant's daughters and spent two months investigating the allegations. Thereafter, the officer went to the defendant's house one day, at 4 p.m., and knocked on the door. At the door, the officer told the defendant he had spoken with the daughters and had received their versions of the alleged abuse. The officer asked whether he could speak to the defendant about the allegations, to which the defendant responded, "Fine," and invited the officer into the house. The officer told the defendant he was not under arrest and did not have to speak with him. The defendant allowed the officer to interview him for a little more than an hour, on tape, during which he made incriminating statements. Two days later, the defendant was arrested and charged.

The defendant sought to suppress his taped statement from evidence on the ground that the officer did not give him *Miranda* advisements. On appeal, this Court affirmed the lower court's ruling denying the motion to suppress. We held that the defendant was not in custody during the taped interview, observing, "There [was] nothing in the circumstances of the ... interrogation of the [defendant] at [his] home, during which and after which [he] was not under arrest, that suggests that he was deprived of his freedom of action in any significant way." 88 Md.App. at 209–10, 594 A.2d 609.

Again, the only common thread between *Reynolds* and this case is that the interrogation took place in the defendant's home. In *Reynolds,* however, the officer went to the defendant's house during the day, not late at night; the officer made it clear to the defendant that he did not have to submit to questioning and was not under arrest; and the defendant invited the officer into the house. Those circumstances are entirely different from the situation here, in which several officers appeared late at night at the appellant's house, entered not by his invitation, but by the permission of a young child, and proceeded to question the appellant in his bedroom.

The State also relies on *In re Shannon A.,* 60 Md.App. 399, 483 A.2d 363 (1984), *cert. denied,* 302 Md. 570, 489 A.2d 1129 (1985), in which we concluded that a delinquent child was not in custody when he was questioned by the police at his home with his mother present. The child, then 13, was at home playing with his ten-year-old sister and a ten-year-old friend when a call was made to paramedics reporting a shooting. The child's parents were not home. The paramedics found the body of the ten-year-old friend on the front lawn with a severe wound to the head. They called the police, and several officers arrived at the scene at about 1:00 p.m.

One officer, who was a neighbor, spoke with the child outside the house, and asked him what had happened. The child said the injured child had fallen and hit his head, and then took the officer inside and showed him the bedroom in which the accident supposedly had occurred. In the meantime, the child's mother arrived home. When a bullet was recovered in the bedroom, the officer told the child and his mother about it. Because a crowd was gathering, the officer took them into the squad car to discuss the matter further. The child then broke down and said he had found the gun in his parents' bedroom and accidentally had shot the friend.

In explaining why the questioning of the child did not amount to custodial interrogation, we pointed out that the police went to the child's home in response to a call about a possible shooting, and that their initial questions were "in the nature of '[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process,' *Miranda v. Arizona, supra,* 384 U.S. at 477, 86 S.Ct. 1602 ..., which does not require *Miranda* warnings to be admissible." 60 Md.App. at 407, 483 A.2d 363. We went on to state that even though by the time the child gave his second, incriminating statement, the police must have thought he was involved in the shooting in some way, the circumstances of the questioning were not coercive. We emphasized that the questions were asked by one officer, who knew the child; the child was not restricted in his movements; his mother was present; and the questioning was very brief.

Again, the situation in which the child in *In re Shannon A.* was questioned does not compare to what transpired in this case. In *In re Shannon A.*, the child's home was itself the crime scene. The police went there for the primary purpose of learning whether a crime had occurred and securing evidence if it had, and with no thought that the child was a suspect. In this case, by contrast, the officers had investigated the crime scene, which was elsewhere, and went to the appellant's house to confront him with and question him about the evidence linking him to the crime. Moreover, in *In re Shannon A.*, the police questioning that ultimately occurred was by one officer, who was a neighbor, during normal hours, in a squad car, with the child's mother present. The circumstances were not accusatory, threatening, and intimidating, as they were in this case.

■ Finally, the State maintains that any error by the trial court in admitting the appellant's statements to the police into evidence was harmless. We disagree.

■ The standard for determining whether error is harmless or prejudicial was stated by the Court of Appeals in *Dorsey v. State:*

> [W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated.

276 Md. 638, 659, 350 A.2d 665 (1976). Moreover, "when the error involves the admission or exclusion of evidence ..., '[s]uch reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of-whether erroneously admitted or excluded-may have contributed to the rendition of the guilty verdict.'" *Merritt v. State,* 367 Md. 17, 31, 785 A.2d 756 (2001) (quoting *Dorsey v. State, supra,* 276 Md. at 659, 350 A.2d 665).

From our review of the record of the trial in this case, we cannot say, beyond a reasonable doubt, that there was no

reasonable possibility that the motion court's error in admitting the appellant's statements to the police into evidence contributed to the guilty verdict. Although there apparently were witnesses on the parking lot on the night in question who were able to identify the appellant as the person who drove the tractor trailer off the lot, and struck other vehicles in doing so, none of those witnesses testified at trial. The primary evidence placing the appellant behind the wheel of the tractor trailer was his acknowledgment to the police that he was the driver. Accordingly, the motion court's error was not harmless.

**JUDGMENT REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR FURTHER PROCEEDINGS. COSTS TO BE PAID BY HARFORD COUNTY.**