REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 637

September Term, 2015

_____

IN RE: A.N., B.N., AND V.N.

_____

Woodward,
Leahy,
Moylan, Charles E., Jr.
      (Retired, specially assigned),

JJ.

_____

Opinion by Leahy, J.

_____

Filed: December 16, 2015

Two-month-old B.N. was taken by his parents to the emergency room at Howard County General Hospital on October 17, 2013, after his daycare provider discovered an injury to his arm. X-rays revealed that B.N. had a complete fracture of the humerus. The attending doctor reported that the injury, not common in a two-month-old, was caused by a "twisting force." B.N. was taken by ambulance to Johns Hopkins Hospital where a skeletal survey revealed that B.N. also had a posterior rib fracture and a healing clavicle fracture.

After receiving notice from the Howard County Hospital that B.N.'s right humerus was fractured, the Appellee, Howard County Department of Social Services (the "Department"), quickly intervened and implemented a "safety plan" that required, among other things, that Appellants M.N. and T.N. ("Father" and "Mother," or "Parents") take their other two babies, A.N. and V.N., to have physical examinations the following day.

A skeletal survey of A.N., B.N.'s twin brother, revealed that A.N. had an older skull fracture as well as a fractured rib. Their older sister, V.N., was not found to have any injuries. Despite the extent of the infants' injuries, the Parents maintained that they did not know about the injuries or the manner by which the infants sustained such injuries. The Department immediately removed all three children from the physical care and legal custody of the Parents and placed them in shelter care.

On October 21, 2013, the Department filed a "Child in Need of Assistance" ("CINA") Petition for each child. That same day, a Shelter Care Hearing was held in the Circuit Court for Howard County (sitting as the juvenile court) in which the magistrate

recommended and the court ordered that the children be placed in the custody of their grandmother, C.N., and that the Parents would be allowed supervised visitation.

Throughout the next year, the Parents willingly participated in various treatment and evaluation programs, and Department reports indicated that they were "appropriate with the children during visits." The Parents' psychological evaluators ultimately concluded that neither parent presented risk or danger to the children. As late as August 28, 2014, the Department and the court-appointed special advocate recommended beginning a monitored transition to custody with the Parents. Then on October 9, 2014, Mother's polygraph examination indicated that she was not being truthful.

On April 7, 2015, the juvenile court held a permanency planning review hearing. The court received the Department's February 23, 2015, report, which recommended— based, in part, on the results of Mother's October 9, 2014, polygraph examination—that the permanency plan for all three children be changed to a sole plan of custody and guardianship with paternal relatives. The court concluded, as reflected in its subsequent order dated May 1, 2015, that "objections to the polygraph exam results were waived and the Court can consider the results." Noting that "[b]oth parents deny causing the injuries and continue to be a 'united force' in their denial," the court found that reunification with the Parents was not in the best interest of the children and, subsequently, modified the permanency plan to remove the goal of reunification.

On May 26, 2015, Father and Mother noted the instant appeal. The Parents raised

2

numerous evidentiary issues in their briefing, but the principal issue on appeal is whether it was reversible error for the juvenile court to consider and rely on the results of Mother's polygraph examination.

We hold that, because "[i]t is well-settled in Maryland that the results of a polygraph test are inadmissible," and even "mere references to the fact that a test was taken . . . may be grounds for reversal if results can be inferred from the circumstances or if the references are prejudicial," *Murphy v. State*, 105 Md. App. 303, 309-10 (1995) (citations omitted), the juvenile court erred in considering Mother's polygraph results. Under the facts of this case, that consideration was prejudicial, and the court erred in changing the CINA permanency plan based, in part, on consideration of that inadmissible evidence. We therefore vacate the May 1, 2015, orders and remand.

## BACKGROUND

The twin boys, A.N. and B.N., were born on August 12, 2013. Father and Mother were already parents to V.N., born less than a year earlier after the Parents' long struggle with infertility. Parents are employed as financial analysts. Mother cared for the twin boys at home until they were six-weeks old, when they, along with their sister, began attending daycare on September 30, 2013.

On the afternoon of October 17, 2013, the daycare provider called Father and told him that she noticed after B.N.'s nap that his arm was injured. Parents picked up the children and then called their pediatrician, who had seen the twin boys the day before. The

3

pediatrician instructed Parents to take B.N. to the emergency room.

Doctors examined B.N. at Howard County General Hospital and determined that his right humerus was completely fractured. The hospital report stated that the fracture was recent and was likely caused by a "twisting force." The hospital then immediately notified the Department of the injuries and potential child abuse situation. Although the twin boys had been seen by their pediatrician regularly since their birth, no injuries had previously been detected. However, after B.N was taken by ambulance to Johns Hopkins Hospital that same day, a skeletal survey revealed that B.N.—not yet nine weeks old—also had a posterior rib fracture and a healing clavicle fracture. Dr. Anders, the Director of Pediatric Emergency Medicine at Johns Hopkins, made the assessment that "someone did this and this is consistent with child abuse." He advised that B.N.'s siblings come to Hopkins as soon as possible for full skeletal scans.

B.N.'s twin brother and older sister were brought to Johns Hopkins Hospital the next day, October 18, 2013. The hospital notified the Department that tests confirmed that the twin, A.N., had an older skull fracture and fractured rib. The sister had no injuries. In response to the information about A.N.'s injuries, Father admitted that he had dropped the infant onto a carpeted floor the week before because the family dog had come up behind him and he had stumbled over the dog. Otherwise, both parents maintained that they did not abuse any of the children and did not know how the twins sustained their injuries. Medical experts, however, determined that A.N.'s injuries were "consistent with

4

non-accidental trauma," and A.N.'s injuries were diagnosed as child abuse. That same day, all three children were removed from the physical care and legal custody of Parents and placed in shelter care.

On October 21, 2013, CINA petitions were filed for each of the children, and a shelter care hearing was held in the juvenile court. The magistrate determined that the children would be placed in the custody of their paternal grandmother, C.N., and that Mother and Father would have supervised visitation. Meanwhile, Father and Mother moved out of their home to allow the paternal grandparents to reside in the home with all three children. Father and Mother moved in with Mother's parents.

On October 25, 2013, a revised shelter care order was entered establishing that "Mother shall visit the children three hours per day Monday through Friday," and that "Mother and Father shall visit for an additional two hours per day, Monday through Friday." On weekends, the parents were allowed to visit for one three-hour visit and one two-hour visit on Saturday and Sunday. The Adjudication/Disposition Hearing was set for November 13, 2013.

**The 2013 CINA Adjudication Hearing**

A magistrate conducted a CINA adjudication/disposition hearing over three days: November 13, December 11, and December 18, 2013.[1] The magistrate heard the

_____

[1] A "CINA" case refers to proceedings brought for the protection of children and coming within the provisions of Maryland Code (1974, 2013 Repl. Vol., 2014 Supp.), Courts and Judicial Proceedings Article ("CJP") §§ 3-802(a)(1), 3-801(g). Maryland law

testimony of several experts, beginning with Dr. Wendy G. Lane, a board certified general pediatrician and specialist in child abuse pediatrics from the Child Advocacy Center at the University of Maryland School of Medicine. Dr. Lane examined the children and, regarding the injuries to two-month old B.N., stated in her expert report:

> There is no history of injury to explain the fractures . . . [Father] acknowledged that [B.N.]'s arm didn't appear right that morning [October 17, 2013], the injury likely occurred on the day that he was brought to the hospital, prior to being dropped off at daycare. Oblique fractures indicate a twisting injury, which [B.N.] could not have caused himself.

Dr. Lane's report noted that the most likely explanation for B.N. having injuries in various stages of healing was abuse. However, she also considered other potential causes for the injuries to B.N. and A.N. not indicative of abuse or neglect and stated:

> Birth injury was considered as an explanation for the healing clavicle and rib fractures. However, I reviewed a chest x-ray (report and films) taken on the day of birth, and there were no fractures present at that time. Rickets (from inadequate vitamin D store/intake) does not typically present early in infancy because children receive vitamin D from their mother in utero. Osteogenesis Imperfecta should be considered because paternal grandmother has identified some risk factors in the family history. However, most of these risk factors have not been noted elsewhere in [B.N.]'s medical records, and details may need to be clarified.

---

defines a child in need of assistance as:

> [A] child who requires court intervention because:
> (1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
> (2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

CJP § 3-801(f).

Dr. Lane recommended that both A.N. and B.N. see a Pediatric Geneticist for evaluation for Osteogenesis Imperfecta (brittle bone disease). She noted, however, that "[i]n the absence of th[at] diagnosis, the only reasonable explanation for B.N.'s injuries is abuse."

Dr. Richard S. Strahlman, head of pediatrics at Columbia Medical Practice—where the children received primary healthcare—also examined the x-rays from B.N.'s date of birth and found the clavicle to be "intact." In addition, Dr. Strahlman opined that A.N.'s skull and rib fractures were a sign of trauma and not indicative of Osteogenesis Imperfecta.

The Parents called Dr. Doug Benson, a board certified orthopedic surgeon and Director of Orthopedic Trauma at the Enloe Medical Center in Chico, California. He testified that A.N. and B.N. had rickets, and that rickets caused their injuries. Dr. Benson was accepted as an expert in orthopedic medicine; however, because he had no specialized training in pediatrics or pediatric child abuse, his testimony on those issues and the cause of the children's injuries was found by the magistrate not to be credible.

During the time between the adjudication hearings before the magistrate and entry of its order, the juvenile court appointed Susan Gordon of the Howard County Court Appointed Special Advocates Program ("CASA") to represent all three children, as a friend of the court. Then, on January 10, 2014, the juvenile court entered an adjudication/disposition order for each of the children. In accordance with Maryland

7

Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP") § 3-819[2]

and Maryland Rule 11-115[3], the juvenile court determined the children to be CINA and

---

[2] CJP § 3-819 provides, in pertinent part:

(b)(1) In making a disposition on a CINA petition under this subtitle, the court shall:

> (i) Find that the child is not in need of assistance and, except as provided in subsection (e) of this section, dismiss the case;

> \* \* \*

> (iii) Subject to paragraph (2) of this subsection, find that the child is in need of assistance and:
> > 1. Not change the child's custody status; or
> > 2. Commit the child on terms the court considers appropriate to the custody of:
> > > A. A parent;
> > > B. Subject to § 3-819.2 of this subtitle, a relative, or other individual; or
> > > C. A local department, the Department of Health and Mental Hygiene, or both, including designation of the type of facility where the child is to be placed.

[3] Maryland Rule 11-115 provides, in part:

**b. Disposition--Judge or Magistrate.** The disposition made by the court shall be in accordance with Section 3-820 (b) of the Courts Article. If the disposition hearing is conducted by a judge, and his order includes placement of the child outside the home, the judge shall announce in open court and shall prepare and file with the clerk, a statement of the reasons for the placement. If the hearing is conducted by a magistrate, the procedures of Rule 11-111 shall be followed. In the interest of justice, the judge or magistrate may decline to require strict application of the rules in Title 5, except those relating to the competency of witnesses. A commitment recommended by a master is subject to approval by the court in accordance with Rule 11-111, but may be implemented in advance of court approval.

ordered them committed to the custody of the Department and placed with their paternal grandmother pending further review. The juvenile court found, by a preponderance of the evidence, that the injuries sustained by B.N. and A.N. were "consistent with non-accidental trauma," and that both parents—unable or unwilling to explain the injuries—"either abused the [children] or neglected them by failing to protect them." The juvenile court stated:

> [Mother and Father] were the primary caregivers for [the children] at the time [A.N.] and [B.N.] sustained injuries. Either [Mother or Father] caused [A.N.] and [B.N.] to be injured and either [Mother or Father] failed to protect [the children] from injury.

> * * *

> The child[ren] require[] court intervention; [t]he child[ren] ha[ve] been abused and ha[ve] been neglected and the child[ren]'s parents are unable or

> * * *

> **d. Commitment to Department of Social Services.** In cases in which a child is committed to a local department of social services for placement outside the child's home, the court, within 18 months after the original placement and periodically thereafter at intervals not greater than 18 months, shall conduct a review hearing to determine whether and under what circumstances the child's commitment to the local department of social services should continue. Considerations pertinent to the determination include whether the child should (1) be returned home, (2) be continued in foster care for a specified period, (3) be placed for adoption, or (4) because of the child's special needs or circumstances, be continued in foster care on a permanent or long-term basis. The hearing shall be conducted as prescribed in Rule 11-110 or, if conducted by a magistrate, as prescribed in Rule 11-111, except that the child's presence shall not be required if presence at the hearing is likely to cause serious physical, mental, or emotional harm to the child.

unwilling to give proper care and attention to the child[ren] and the child[ren]'s needs. One parent has abused the child[ren] and the other parent has failed to give proper care and attention to the child[ren] under the circumstances that the child[ren]'s health or welfare is harmed or placed at substantial risk of harm. One parent is unable or unwilling to believe that the other parent harmed the child[ren] and is unable or unwilling to provide proper care for the child[ren].

The January 10, 2014, court order maintained the visitation schedule set by the October 23, 2013, revised shelter care order and ordered genetic testing of the children "to rule out genetic disease or deformity."

**Expert Reports and Department Recommendations**

After the genetic testing of B.N., the Department filed a report with the juvenile court dated April 18, 2014, detailing that B.N. was found to not be suffering from Osteogenesis Imperfecta or rickets. A.N. was not tested on the assumption that, as an identical twin, testing one child was sufficient.

The Department's April 18 report, submitted for consideration at the next review hearing, acknowledged that the permanency plan for all three children was reunification with the Parents, but recommended that the children remain in the custody of their paternal grandparents, with a review of the placement in six months.[4]   The report further indicated

_____

[4] The Department proceeded under CJP § 3-823 in this case in recommending a plan that included future reunification with the Parents.   We note that the Department may now have the option in certain abuse cases to petition the court to relieve the Department of any statutory obligations it has toward facilitating reunification with the parents under "Anayah's Law," recently passed by the General Assembly and made effective on October 1, 2015. 2015 Md. Laws ch. 292 (S.B. 150) (codified at CJP 8-312).   The law was passed in response to the tragic death of Anayah Williams in 2012.   Department of Legislative

that Father and Mother both signed a service agreement on January 30, 2014, completed parenting classes, completed anger management classes, were actively involved in individual and couples therapy, visited the children regularly, and agreed to submit to a polygraph and forensic evaluation. The service agreement provided that Father and Mother could use an independent provider for the polygraph examination, but it reserved the Department's right to submit questions to be asked. The initial polygraph examination was scheduled for April 25, 2014.

---

Services, Fiscal and Policy Note 2015 S.B. 150. Anayah Williams, an infant, was placed in foster care with a fractured skull and rib, but after an investigation failed to reveal the perpetrator of her injuries, she was returned to her parents. Soon after being reunited with her parents, the child died after sustaining additional severe injuries. *Id.* Anayah's Law states that it was passed

> FOR the purpose of altering the circumstances under which a local department of social services may ask the court in a child in need of assistance proceeding to find that reasonable efforts to reunify the child with the child's parents or guardian are not required . . . and generally relating to child abuse and neglect.

2015 Md. Laws ch. 292 (S.B. 150).

Anayah's Law allows for the local Department of Social Services ("Department," for purposes of this footnote) to petition the court to find that reasonable reunification efforts are not required if the Department concludes that the child has been subjected, by the parent or guardian, to sexual abuse, torture, or severe physical abuse; or if it finds that the parent or guardian has engaged in or facilitated certain abuse, neglect or torture of the child, a sibling, or another child in the household. CJP § 3-812(b). The Department may also petition for the same if the parent or guardian abandoned the child or "knowingly failed to take appropriate steps to protect the child" from abuse, neglect, or torture in the household. *Id.*

On June 23, 2014, John Lefkowits, Ph.D., completed a psychological evaluation report for Father. Dr. Lefkowits's report diagnosed Father with adjustment disorder with mixed anxiety and depressed mood, "expected distress based on the allegations from social services and removal of his children," but, overall, found that Father "does not represent any risk or danger to his children and it is unlikely that he engaged in any behaviors which would have previously harmed his children." Dr. Lefkowits recommended reunification with children at the earliest possible date.

Dr. Lefkowits released a similar psychological evaluation report for Mother on June 25, 2014. The report diagnosed Mother with adjustment disorder with mixed anxiety and depressed mood, "due to the stress of a social service investigation and removal of her children," but overall found that Mother "does not represent any risk or danger to her children and it is unlikely that she engaged in any behaviors which would have previously harmed her children." Dr. Lefkowits again recommended reunification with children at the earliest possible date.

In preparation for the approaching July 23, 2014, permanency plan review hearing, the Department filed a report with the juvenile court recommending that the children be gradually reunited with the Parents through a reunification program. Parents also filed a line attaching a medical report from Charles J. Hyman, M.D., F.A.A.P., a board certified pediatrician in the State of California. Dr. Hyman founded and directed the Loma Linda University Medical Center's child abuse team in the late 1970s, and was at the time a

member of an infant injury evaluation group that studied diseases and injury of infants that could be misconstrued as child abuse. Dr. Hyman's lengthy report posited that the twins, being premature, could have suffered from bone fragility disorder and rickets, which could explain their fractures. Dr. Hyman maintained that child abuse should not be the assumed cause of injury, where there is no other evidence of such abuse, and no other organs—including the skin—showed signs of trauma. CASA Susan Gordon also filed a report for the July 23, 2014, hearing, recapping the case and recommending, based on her observation of the family and the assessments by the therapists and psychologist that "it is appropriate for the parents to regain care of their children," even though "it remains a troubling mystery how A.N. and B.N. received such serious injuries . . . ."

**The Polygraph Problem**

At the July 23, 2014, review hearing before the magistrate, the Department submitted on its report and stated on the record:

> [I]deally we would like to know what happened to the children. Realistically I don't believe the police are going to pursue this matter. We might not ever know what happened to the children.
> But the parents have done everything the Department has asked them to do. They've completed the service agreement. They've completed the parenting program, psychological, and the individual and couple's counseling.
> We're not sure what else we can ask them to do, so we're recommending [] a slow transition back into the custody of the parents with some oversight by the Department making announced and unannounced home visits.

Although the Department had not changed its position that one of the parents caused

13

the serious injuries to the children, it was willing to move forward with reunification. Nonetheless, counsel for the Parents brought Dr. Hyman's report to the magistrate's attention, as well as the fact that both Father and Mother had passed private polygraph tests in support of their argument that no child abuse had occurred. This prompted the magistrate to ask the Department about the polygraph examination, and the Department responded:

> We asked the parents to participate in the polygraph. Our stipulation was that we were involved. . . . We asked the parents to coordinate with [the investigating officer] Detective Camp.
>
> * * *
>
> And then they called. Detective Camp had . . . 10 minutes notice to get to the polygraph. With 10 minutes notice Detective Camp was not able to get to the polygraph and [neither] the Department nor the Detective were able to submit questions.
> So we took the results of the test that they gave us. We asked the police polygrapher (sic) to look at them. He gave us his opinion as to the validity of the exam and we accepted the results.

At the conclusion of the review hearing, the magistrate made recommendations on the record, stating:

> [I]n my opinion, the parents haven't fully complied in that they haven't submitted to a polygraph that's been offered by the Department and there is no explanation for the injuries.
> If one parent was willing to take responsibility for the infliction of the injuries [] I'd feel very comfortable moving on. In this circumstance I am not of a mind that I can assure that the children are safe in their home without the current conditions in place, and I'm recommending that the status remain the same.

On July 25, 2014, Father and Mother filed exceptions to the magistrate's report and

14

recommendations, arguing that the magistrate incorrectly denied their request for immediate reunification where all the current reports before the court indicated that the Parents posed no threat to the children. The Parents argued that, because the Department had not specified requirements for the polygraph—other than that the Parents must submit to one—and because the Department advised on the record that they received the polygraph and their expert was satisfied with the conclusion, the magistrate erred in concluding that the private polygraph was insufficient for compliance with the Department's Service Agreement. Regarding the magistrate's concern over their "willing[ness] to take responsibility for the infliction of the injuries," the Parents argued that "[the magistrate] has placed the parents in the impossible position of confessing to a criminal act in which the Parents had reported and testified under oath that they had no knowledge of how the injuries occurred."

On August 28, 2014, a *de novo* review hearing on the exceptions was held in the juvenile court before a judge. The Department again submitted on its report prepared for the July 23, 2014, hearing and recommended that "the children remain in the care and custody of the Department of Social Services, but we start a procedure whereby they can return to the fulltime (sic) care of their parents." The juvenile court remained concerned, however, that a finding had been made that abuse occurred without an indication of which parent was the abuser. The court observed:

> It was either one or both of the parents, and now [the Department's] asking
> this Court to send the children back into their care when we don't know what

15

happened. How can the children be safe in the future? That's the problem that I see the [magistrate] had, that even I had on reviewing this.

Addressing the independent polygraph, the court agreed with the magistrate that, because the Department had no input in the polygraph, the Parents did not comply with the requirements of the Service Agreement.

On September 12, 2014, the circuit court (sitting as the juvenile court) entered a review hearing order accepting the magistrate's findings in the July 23 hearing. However, the court went beyond the magistrate's recommendation that the status quo be maintained and determined that the existing sole plan of reunification was not in the best interest of the children. The circuit court changed the permanency plan for the children to a concurrent plan of reunification with the Parents or placement with relative for custody and guardianship. In addition, the court ordered the Parents to submit to another polygraph examination and a "fitness to parent evaluation" to be arranged by the Department. Finally, the court ordered that the next permanency plan hearing be set before a judge in the circuit court, rather than before a magistrate.

The next permanency plan hearing was scheduled for December 4, 2014, and the Department filed its report for that hearing with the court on November 21, 2014. The report stated that the Department arranged, and the parents submitted to, a second polygraph examination on October 9, 2014. The Department's report stated:

> As a part of their service agreement, the parents agreed to take a polygraph. A polygraph is a tool for the Department to use when completing a risk assessment. Both parents took polygraphs at Chesapeake Polygraph,

16

as arranged by their attorney, and both passed. The Department, however, was not permitted to participate in the polygraph offered at Chesapeake Polygraph. On August 28, 2014, the court ordered the parents to submit to a polygraph that would allow participation from [the Department]. The Department arranged for [both Father and Mother] to take a polygraph at the Howard County Police Department on 10/9/14. [Father] passed the polygraph. [Mother] did not pass; her results indicated deception.

The Department's recommendation at that point was that the children remain in the custody of the agency with a concurrent plan of reunification and custody and guardianship to a relative.

On February 25, 2015, the Department filed an updated report for the court for the next permanency planning review hearing. Importantly, the Department changed its recommendation to remove reunification from the permanency plan, and instead advocated for a sole plan of custody and guardianship with the children's paternal relatives with another review in six months. On the same date, CASA filed a report recommending that the children be placed in the custody of their paternal grandparents with liberal visitation with the Parents. The CASA report concluded that because the injuries to the children remain unexplained and because "[Mother] was found to be deceptive during the polygraph examination," the only way to reasonably ensure the continued safety of the children was to give custody to the grandparents.

**The April 7, 2015, Review Hearing**

On April 7, 2015, the permanency planning review hearing was held in the circuit court. At the outset of the hearing, the court brought to Parents' counsel's attention the

17

potential conflict of interest presented by representing both Father and Mother in light of their differing polygraph results. Counsel for the Parents responded by making a preliminary objection to the polygraph results. The court observed:

> Well, I find it interesting, you wanted to submit, or you confirmed that your sole polygraph test was okay because they both came back as non-deceptive. Now I [] require the [Department] to be involved, and one comes back to be deceptive, now you're going to want that information to be not considered by this Court, I find that interesting.

Thereafter, at the urging of the court, both Father and Mother were questioned on the record about their knowledge of and consent to representation where there may be a conflict, and counsel agreed to submit informed written consent from each parent to the court after the lunch recess.[5]

Following the voir dire of the Parents, counsel formally objected to introduction "not only of the polygraph results, but . . . [to] any provision of the Department's report as well as any report which indicates a deceptive finding[.]" The Parents' counsel cited *Kelley v. State*, 288 Md. 298 (1980), for the proposition that polygraph-based evidence is not admissible in a court proceeding. The court then took a short break to review *Kelley v. State* and, upon return, stated:

> [T]he Court [in *Kelley*] did in fact say, because it talked about the reliability of [polygraph] examinations and referred to *Reed v. State*, and *Lusby v. State*, and the Court does say, "We conclude therefore, that until such time as the reliability of this particular type of scientific testing can be appropriately established to the satisfaction of this Court, testimony which

---

[5] The Parents' signed conflict waiver was filed with the clerk when the proceeding recommenced after lunch recess.

directly or indirectly conveys the results of such tests should [] not be admitted."

So that's clearly the ruling and holding in *Kelley*, so, based on that, even though it is a tool that we use, since the reliability -- this is from 1980, has not been scientifically established, the Court will grant the request, and the polygraph results will not be considered.

Opening statements followed, and during her opening, attorney for the children Connie Ridgway, advocated for transitioning the children into the custody of the Parents. Ms. Ridgway, who was appointed to represent all three children on October 24, 2013, stated:

> I actually believe, Your Honor, that there should be a transition plan for the parents. Even if, let's say, for sake of argument, one of the parents had admitted to whatever may have occurred; Your Honor, we still have to work towards reunification. And part of that work towards reunification is setting out a . . . service agreement . . . . The parents have lived up to everything required of them . . . . [T]he therapist is recommending that there is no further fear of abuse by these parents.

> * * *

> I just don't believe, Your Honor, based on what I know of this case, that a transition plan could not be put in place that would assure the safety of the children, assure the Department of their continued growth, and assure this Court that, in fact, the children could be raised by their parents, given the transition plan.

The Department's witness, Cheryl Lawson-Anderson—a foster care social worker with the Howard County Department of Social Services—testified that she had observed the children in their current living situation, that the Parents had complied with all the terms of their Service Agreement, and that there were no other services that the Department could offer to the Parents. She maintained, however, that the Department was recommending a

19

sole plan of custody and guardianship to a relative. In listing the Department's considerations leading to their recommendation, Ms. Lawson-Anderson cited the extent of the injuries to the children, the reports of Dr. Means and Dr. Lefkowits, and the polygraph. The Parents' counsel immediately objected to the testimony; however, the Court overruled the objection, stating "I'm not admitting the results, she's just saying she considered the polygraph[.]"

Further into Ms. Lawson-Anderson's examination, the following exchange occurred:

[DEPARTMENT'S COUNSEL]: Now, why did your recommendation change between July 2014 and now?

[MS. LAWSON-ANDERSON]: The main reason was the results of the polygraph.

[PARENTS' COUNSEL]: Objection.

THE COURT: Overruled.

[DEPARTMENT'S COUNSEL]: And what were –

[MS. LAWSON-ANDERSON]: And --

[DEPARTMENT'S COUNSEL]: -- the other reasons?

[MS. LAWSON-ANDERSON]: -- that one was deceptive?

[PARENTS' COUNSEL]: Objection.

THE COURT: That part I'll sustain.

Next, Dr. Ronald F. Means testified regarding the results of his parental fitness

evaluation,[6] and concluded that "[t]o a reasonable degree of medical certainty, I'm of the opinion that [Father and Mother] are more than adequate parents." Dr. John Lefkowits also testified regarding his report and the Parents' psychological evaluations. Dr. Lefkowits opined that, to a reasonable degree of psychological certainty, neither parent represented any risk or danger to the children.

Paternal grandmother and custodial guardian of the children, C.N., testified regarding her observations of the children and their interactions with Father and Mother, maintaining that she did not believe that the Parents ever abused the children. In her opinion, reunification was in the best interest of the children. At the end of her direct examination, C.N. was asked by the Parents' counsel whether the Department had communicated to her why it changed its position regarding reunification, and she replied: "[the Department] said [Mother] failed the poly and nobody's admitted to [the abuse], and the judge wouldn't go for it."

---

[6] On or about February 19, 2015, Dr. Ronald F. Means completed the evaluation of Mother and Father on behalf of the Department. Dr. Means's evaluation consisted of in-person interviews with each parent separately, observation of the family, telephone interviews with the individual and marriage therapists, telephone interviews of the maternal grandfather and paternal grandmother, and review of the medical evaluation by Dr. Lane and the forensic examinations by Dr. Lefkowits. Dr. Means's evaluation concluded:

> To a reasonable degree of medical certainty, with the exception of the abuse allegations, all evidence supports that [the Parents] have more than adequate parenting abilities and are capable of providing a supportive, nurturing environment for their children. Nearly all sources of information support this conclusion, decreasing the likelihood that they are trying to present in an unreasonably favorable fashion.

There was no further mention of the polygraph until the middle of the closing argument by the Parents' counsel, when the following colloquy occurred:

[PARENTS' COUNSEL]: . . . Now in regards to [the Department]'s change of plan, I have no idea why.    What's the reason that they have changed their plan? In July of 2014 --

THE COURT: You elicited from [C.N.] Which just puzzled me. I granted your motion, and what did you do?

[PARENTS' COUNSEL]: Well, Your Honor –

THE COURT: You -- stop. You asked Ms. N., "Why did Cheryl Lawson-Anderson say she changed her mind?" And the answer, which shocked me that you would elicit that, now I think that's a waiver, because your client, [Mother], failed the polygraph and the judge wouldn't go for it.

[PARENTS' COUNSEL]: Respectfully --

THE COURT: So -- no, no, no, so, that's [] the testimony that you presented to this Court. So, clearly we know why [the Department] changed -- or DHR changed their opinion.

At the close of the proceeding the court reiterated:

[C]learly, even though I indicated earlier, . . . I granted the motion, [I] wasn't going to consider everything about the polygraph . . . until Counsel asked her, "Why did [the Department] say they changed their opinion?" And she said, "They changed their opinion because [Mother] failed the polygraph, and the judge won't go for it." Wow. Okay, so, that's -- we know based on that testimony, that [Mother] failed the polygraph.

On May 1, 2015, the juvenile court entered permanency planning review hearing orders for the children, finding it to be in the children's best interest to remove reunification from the permanency plan and seek placement with a relative for custody and guardianship instead.    The court discounted the recommendations and reports of Dr. Means and Dr.

22

Lefkowits because both doctors admitted that their findings were based on the premise that neither parent abused the children. Significantly, the court did consider evidence of the second polygraph when changing the permanency plan. The court stated:

> [The Department] originally recommended that the children be returned to the care and custody of the parents, however, due to the results of the polygraph examination, changed the recommendation to custody and guardianship with a relative.

> \* \* \*

> In January 2014 and July 2014 the Court found that, even though the parents have maintained their innocence and deny causing the children's injuries, it is abundantly clear and already established by the Court that the two boys sustained serious injuries that are indicative of child abuse while in the care and custody of their parents, and one or both of them physically abused these children and the children are not safe in their care.

> \* \* \*

> The Court, based on the parents counsel's request, excluded the results of the polygraph examination, however, the parents counsel, during the questioning of the [Department] case worker elicited from the worker that the mother's polygraph examination results indicated deception, and that the mother was not being truthful, which is why [the Department] changed their recommendation from reunification to custody and guardianship with a relative. By eliciting testimony from the [Department] case worker, the objection to the polygraph exam results were waived and **the Court can consider the results.** . . . Reunification with a parent who has abused them and/or failed to protect them [is] not in the children's best interest.
> The Court finds that the child[ren]'s permanency plan is: Placement with a relative for custody and guardianship.

On May 26, 2015, the Parents noted this timely appeal. They present the following issue:

Whether the circuit court abused its discretion when it found that

reunification is not in the best interest of the children, after admitting evidence of the results of a polygraph test during the April 2015 permanency plan hearing review, and considering all of the competent and credible evidence of the record.

Additional facts will be introduced as they pertain to the issues discussed.

## DISCUSSION

### A. Standard of Review

When reviewing an order regarding a permanency plan in a CINA proceeding "[t]he appellate standard of review as to the overall determination of the hearing court is one of 'abuse of discretion.'" *In re Yve S.*, 373 Md. 551, 583 (2003). However, when an appellate court reviews cases involving the custody of children generally, it simultaneously applies three different levels of review. *Id.* at 584. First, when an appellate court scrutinizes factual findings, the clearly erroneous standard applies. *In re Shirley B.*, 419 Md. 1, 18 (2011) (citing *In re Yve S.,* 373 Md. at 586). Second, "if it appears that the [juvenile court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless." *Id.* (alteration in original) (quoting *In re Yve S.*, 373 Md. at 586). Finally, when reviewing a juvenile court's decision to modify the permanency plan for the children, this Court "must determine whether the court abused its discretion." *Id.* at 18-19.

### B. Changes to CINA Permanency Plans After a Finding of Abuse

Parents enjoy a well-established and fundamental constitutional right—protected by the Fourteenth Amendment—to raise their children without undue influence by the State,

24

and that right cannot be taken away "'unless clearly justified.'" *In re Yve S.*, 373 Md. at 565-66 (quoting *Wolinski v. Browneller,* 115 Md. App. 285 (1997)). However, that right is not absolute and must be balanced against the State's interest in protecting the health, safety, and welfare of the child. *Id.* at 568-69. Indeed, the Court of Appeals has "'often reaffirmed that [the best interest of the child] takes precedence over the fundamental right of a parent to raise his or her child.'" *Id.* at 569-70 (quoting *Wolinski*, 115 Md. App. at 301). Nonetheless, "the best interests of the child standard embraces a strong presumption that the child's best interests are served by maintaining parental rights." *Id.* at 571 (citing *In Re: Adoption/Guardianship Nos. J9610436 & J9711031*, 368 Md. 666, 692-93 (2002)).

Certainly, the courts of Maryland have recognized that, "in cases where abuse or neglect is evidenced, particularly in a CINA case, the court's role is necessarily more pro-active." *Id.* at 570. Pursuant to Maryland Code (1984, 2012 Repl. Vol.), Family Law Article ("FL") § 9-101, "in cases where evidence of abuse exists, courts are required by statute to *deny* custody or unsupervised visitation *unless* the court makes a specific finding that there is no likelihood of further child abuse or neglect."[7] *In re Yve S.*, 373 Md. at 571

---

[7] FL § 9-101 provides:

**Determine if abuse or neglect is likely**
(a) In any custody or visitation proceeding, if the court has reasonable grounds to believe that a child has been abused or neglected by a party to the proceeding, the court shall determine whether abuse or neglect is likely to occur if custody or visitation rights are granted to the party.

(emphasis in original) (quoting *In re Mark M.,* 365 Md. 687, 706 (2001)). Accordingly,

the Court of Appeals has recognized that courts have a higher degree of responsibility

where abuse has been proven. *Id.* (citing *In re Mark M.,* 365 Md. at 706).

Once CINA proceedings have begun and a permanency plan has been established,

the plan must be periodically reviewed "to determine progress and whether, due to

historical and contemporary circumstances, that goal [of the plan] should be changed."

*Id.* at 582. CJP § 3-823(h) provides, in pertinent parts:

> (1)(i) Except as provided in subparagraphs (ii) and (iii) of this paragraph, the court shall conduct a hearing to review the permanency plan at least every 6 months until commitment is rescinded or a voluntary placement is terminated.
>
> * * *
>
> (2) At the review hearing, the court shall:
> (i) Determine the continuing necessity for and appropriateness of the commitment;
> (ii) Determine and document in its order whether reasonable efforts have been made to finalize the permanency plan that is in effect;
> (iii) **Determine the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment**;
> (iv) Project a reasonable date by which a child in placement may be returned home, placed in a preadoptive home, or placed under a legal

---

> **Deny custody or visitation if abuse likely**
> (b) *Unless the court specifically finds that there is no likelihood of further child abuse or neglect by the party*, the court shall deny custody or visitation rights to that party, except that the court may approve a supervised visitation arrangement that assures the safety and the physiological, psychological, and emotional well-being of the child.

(Emphasis supplied).

guardianship;
(v) Evaluate the safety of the child and take necessary measures to protect the child; and
(vi) Change the permanency plan if a change in the permanency plan would be in the child's best interest.

(3) Every reasonable effort shall be made to effectuate a permanent placement for the child within 24 months after the date of initial placement.

(Emphasis added).

The Court of Appeals has interpreted CJP § 3-823(h)(2)(vi) to mean that an existing permanency plan "may not be changed without the court first determining that it is in the child's best interest to do so." *In re Yve S.*, 373 Md. at 581. Notably, under § 3-823(h)(2)(iii), the review hearing court must "[d]etermine the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment." In evaluating the safety of the child and the continuing necessity for commitment, the Court of Appeals has instructed that, "'even upon substantial evidence of past abuse or neglect, it does not require a finding that future abuse or neglect is impossible or will, in fact never occur, but only that there is no likelihood—no probability—of its recurrence.'" *Id.* at 588 (quoting *In re: Adoption No. 12612*, 353 Md. 209, 238 (1999)). In *In re Yve S.*, the Court cautioned that such a high standard would require the judge to be "a prophet or soothsayer and somehow 'know' that there will never be a future incident of abuse or neglect." *Id.* at 587-88 (footnote omitted). Nevertheless, in a case where there is no evidence as to the cause of the abuse, we recognize the dilemma in measuring "the extent of progress that has been made toward alleviating or mitigating the causes necessitating commitment."

27

In the instant case, after the appalling injuries to the infant twins were exposed, a most troubling circumstance persisted through to the day of the April 7, 2015, hearing—there was still no explanation as to how the infants suffered their injuries. Only three events occurred since the August 28, 2014, *de novo* review hearing on exceptions: first, the passage of additional time, which is a relevant concern under CJP § 3-823(h)(3); second, the results of the parental fitness examination by Dr. Means which concluded that "all evidence supports that [the Parents] have more than adequate parenting abilities and are capable of providing a supportive, nurturing environment for their children"; and finally, the existence of the second court-ordered polygraph examination of Mother that purportedly indicated deception. Still without any resolution as to what happened to the children, the juvenile court was faced with deciding whether to continue the permanency plan of a concurrent plan of reunification with the Parents and custody and guardianship with a relative. As noted above, under § 3-823(h)(2)(iii), the court must evaluate whether the cause of the abuse has been alleviated—a task made decidedly more onerous where the Parents provide no information and take no direct responsibility. Additionally, the court is under a statutory mandate to work towards "a timely, permanent placement for the child[ren] consistent with the child[ren]'s best interests." CJP 3-802(a)(7); *see also* CJP § 3-823(h)(3). Here, again it is clear that our statutes place a heightened responsibility on the juvenile court in cases such as this one to be pro-active in the protection of the well-being and interests of children who have been abused.

28

**C.     Erroneous Reliance on Inherently Unreliable Polygraph Evidence**

The Parents argue that the juvenile court "abused its discretion by finding that reunification is not in the best interest of the children after admitting unreliable and incompetent testimony concerning the results of the polygraph testing and, considering the results in determining whether to change the permanency plan."   The Parents maintain that the admission of polygraph evidence "falls outside the realm of even a 'relaxed' application of the Rules of Evidence[.]"   They contend that their objection to the polygraph results was not waived and that their lay witness, who mentioned the polygraph in testimony, was not qualified or competent to testify regarding the polygraph results. The Department counters that consideration of the polygraph results did not prejudice the Parents because the court's decision to change the permanency plan was based on already adjudicated facts, and not the polygraph results.

"It is well-settled in Maryland that the results of a polygraph test are inadmissible." *Murphy v. State*, 105 Md. App. 303, 309 (1995) (citing *Guesfeird v. State,* 300 Md. 653, 658 (1984); *Lusby v. State,* 217 Md. 191, 194-95 (1958)); *see also Kelley v. State*, 288 Md. 298, 302 (1980) ("[U]ntil such time as the reliability of [polygraphs] has been appropriately established to the satisfaction of this Court, testimony which directly or indirectly conveys the results of such tests should not be admitted.").

In permanency plan review hearings, the court may decline to require strict application of the evidentiary rules, "other than those relating to competency of witnesses."

29

Md. Rule 5-101(c)(6); *see also In re Ashley E.*, 387 Md. 260, 293-94 (2005). However, even under the relaxed evidentiary rules that apply to administrative proceedings, this court has found that polygraph evidence is inadmissible because, "the evidence presented must be considered '*competent*.'" *Dep't of Pub. Safety and Corr. Serv. v. Scruggs*, 79 Md. App. 312, 322-24 (1989) (emphasis in original) (determining that polygraph evidence was admitted in error and "severely prejudiced" the appellee). Moreover, in a permanency plan hearing—notwithstanding that the Rules of Evidence are not strictly applied—the court must still determine whether proffered evidence is "sufficiently reliable and probative to its admission." *In re Billy W.*, 387 Md. 405, 434 (2005).

In *In re Rachel S.,* the Anne Arundel County Department of Social Services received a complaint alleging the possible physical and sexual abuse of a child. 60 Md. App. 147, 149 (1984). An immediate shelter care hearing was held; however, the court ordered the case continued for five days (temporarily approving shelter care) to allow the alleged abusive father to take a polygraph examination. *Id.* at 149-50. When the hearing recommenced five days later, all parties stipulated that the father had passed the polygraph. *Id.* at 150. Notwithstanding that stipulation, this Court stated:

> The erroneous reliance upon the polygraph tests was itself sufficient error to flaw the proceedings. Even if all parties to the adjudication had agreed to accept the results of the polygraph testing, the long settled law in this state is that the technique is considered so inherently unreliable as to preclude the admission of such test results in a trial, civil or criminal. As was unequivocally stated in *Akonom v. State,* 40 Md. App. 676, 680, 394 A.2d 1213 (1978):

> "It cannot logically be argued that a stipulation enhances in any significant way the inherent reliability of evidence produced by a so-called scientific process or art. . . . Thus, while we are generally reluctant to invalidate agreements entered into by the parties, we view this as one of the unusual occasions when we are obligated to do so."

*Id.* at 150.[8]

In *In re Shannon A.*, this Court stated that the "[a]ppellant cannot complain that his own trial conduct constitutes error," after "it was appellant's counsel who first mentioned the word polygraph." 60 Md. App. 399, 410 (1984). However, that case concerned the admissibility of a statement made by a juvenile defendant to a police officer "between polygraph tests." *Id.* This Court did not retreat from the position that "polygraph results are inadmissible." *Id.* In that case, the appellant's contention was that his own trial counsel's mere mention of the word polygraph indirectly conveyed the results of the examination. *Id.* at 409-10. The argument was not (as it is here) that the Court was actually made aware of the results of the polygraph and considered those results in reaching its decision. Thus, in *In re Shannon A.*, it was appropriate to discount the alleged error because it did not challenge a ruling, failure to act, or error on the part of the lower court.

---

[8] Because we conclude, consistent with Maryland case law, that polygraph examinations are "considered so inherently unreliable as to preclude the admission of such test results in a trial, civil or criminal," *In re Rachel S.,* 60 Md. App. at 150, we need not address the level of qualification needed to allow a witness to testify regarding the results of such an examination. Thus, we do not address the Parents' argument that C.N.'s testimony regarding the polygraph was improper lay testimony.

*See id.* (citing *Braun v. Ford Motor Co.,* 32 Md. App. 545, 548 (1976) ("Appellate courts look only to the rulings made by a trial judge, or to his failure to act when action was required, to find reversible error.")). That is not the case here.

Here, the court twice overruled the Parents' objections to testimony, elicited by the Department, that the reason for the change in permanency plan recommendation was the results of the polygraph examination. And, the very same information was elicited by Parents' counsel from another witness later in the hearing, resulting in the waiver of their earlier objections to the polygraph evidence. Nevertheless, under this Court's precedent, it was still error for the court to consider the results of the polygraph. *See In re Rachel S.,* 60 Md. App. at 150; *Akonom,* 40 Md. App. at 680. This is especially clear where this Court's precedent instructs that, even had all parties stipulated to the admissibility of the polygraph results, "the long settled law in this state is that the technique is considered so inherently unreliable as to preclude the admission of such test results in a trial, civil or criminal," and "reliance upon the polygraph tests [i]s itself sufficient error to flaw the proceedings." *In re Rachel S.,* 60 Md. App. at 150.

The Department cites to *Guesfeird v. State*, for the proposition that "there have been cases in Maryland in which references to lie detector tests were held not to be so prejudicial as to warrant reversal." 300 Md. at 659 (1984) (citing *Poole v. State*, 295 Md. 167, 182-84 (1983); *Lusby,* 217 Md. at 195). Indeed, the Court of Appeals in *Guesfeird*, provided

32

a non-exclusive list of factors that courts have considered in determining whether the introduction of polygraph evidence was prejudicial, including:

> whether the reference to a lie detector was repeated or whether it was a single, isolated statement; whether the reference was solicited by counsel, or was an inadvertent and unresponsive statement; whether the witness making the reference is the principal witness upon whom the entire prosecution depends; whether credibility is a crucial issue; whether a great deal of other evidence exists; and, whether an inference as to the result of the test can be drawn.

*Id.* at 659 (citations omitted). Notably, in *Guesfeird*, as in *In re Shannon A.*, (discussed *supra*), the case involved a single reference to a polygraph examination that defense counsel feared would allow the fact-finder to infer a result. *Id.* at 656. Again, that is not the case here.

As discussed above, the references to the polygraph in this case were numerous and originated from the key witness for the Department and a witness for the Parents. Notwithstanding the fact that all involved clearly knew the results of the polygraph, a negative result could certainly have been inferred from the testimony of Ms. Lawson-Anderson—elicited by the Department and sustained over objection—that the Department removed reunification of the Parents and children from its recommendation after considering the results of the polygraph examination. Credibility was a central issue in this case. The Parents maintain that they never abused the children, but the juvenile court, with no plausible explanation for how the injuries occurred and with both Parents united in denying any knowledge, concluded that "one or both parents have either abused the [children] or neglected them by failing to protect them."

33

It is abundantly clear, from the record and the court's May 1, 2015, orders that the juvenile court did consider the polygraph results in making the decision to remove reunification with the Parents from the permanency plan. As noted above, at the close of the April 7, 2015, hearing, the court remarked, "[o]kay, so, that's -- we know based on that testimony, that [Mother] failed the polygraph." Further, in its order, the court stated, "[b]y eliciting testimony from the [Department] case worker, the objection to the polygraph exam results were waived and **the Court can consider the results**." (Emphasis added).

We recognize that a polygraph examination is an important investigative tool, widely used by law enforcement agencies and private industry, and we do not discourage its appropriate use. *See Akonom*, 40 Md. App. at 683 (citing *People v. Barbara*, 255 N.W.2d 171 (Mich. 1977); *U. S. v. Wilson*, 361 F.Supp. 510, 514 (D.Md.1973)).

However, the juvenile court erred in considering the polygraph evidence in a court proceeding, *see In re Rachel S.*, 60 Md. App. at 150, and, under the facts of this case, that consideration was prejudicial. Accordingly, the improper consideration of the polygraph constituted a fatal error in the proceedings, and the court abused its discretion in changing the CINA permanency plan based, in part, on the consideration of that inadmissible evidence.

We note that we have no criticisms or concerns regarding the juvenile court's analysis of the evidence that was *properly* before it. Nor do we criticize the weight the court gave to that evidence, for we give great deference to the credibility determinations of

34

the juvenile court[9] and recognize the heightened responsibility of the court in child abuse cases. Additionally, we do not find error in the Department's internal use of polygraph testing as part of its investigative process. Indeed, in the investigation of suspected child abuse, Code of Maryland Regulations ("COMAR") 07.02.07.11 provides that "[t]he local department may consider any available information regarding the family, individual, or child at issue." However, we must maintain the careful distinction between an investigative tool and evidence that has sufficient reliability for consideration in an adjudicative proceeding. To countenance the admission of inherently unreliable evidence, such as a polygraph test, would set a dangerous precedent, especially in cases like this, where a child has been abused and there is no direct evidence identifying the abuser, or the circumstances surrounding the occurrence of abuse. Certainly, where critical portions of the narrative are unavailable for the court's analysis (who committed the abuse and the surrounding circumstances), unreliable polygraph evidence should not substitute for what is missing—especially given that an abuser may be able to manipulate the test. *See United States v. Scheffer*, 523 U.S. 303, 310 n.6 (1998) ("Even if the basic debate about the

---

[9] Because we remand for a new hearing based on the court's improper consideration of the inadmissible polygraph examination, we decline to address the Parents' numerous contentions regarding the weight given to other evidence properly before the juvenile court. It will be the province of the juvenile court, on remand, to assess that evidence and afford it the weight it merits. *See In re Priscilla B.*, 214 Md. App. 600, 623-24 (2013) (citations omitted) (discussing the "great deference" paid to the first-level fact finding that has "traditionally been carried out in the equity courts by [magistrates] . . .").

reliability of polygraph technology itself were resolved, however, there would still be controversy over the efficacy of countermeasures, or deliberately adopted strategies that a polygraph examinee can employ to provoke physiological responses that will obscure accurate readings and thus 'fool' the polygraph machine and the examiner."). Therefore, it is only due to the court's improper reliance on the polygraph examination in reaching its decision—removing reunification from the permanency plan—that we vacate the May 1, 2015, orders and remand.

**ORDERS OF THE CIRCUIT COURT FOR HOWARD COUNTY DATED MAY 1, 2015, IN CASES 13-I-13-50511, 13-I-13-50512, AND 13-I-13-50513, VACATED.**

**CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY HOWARD COUNTY.**